**NATIONAL ASSOCIATION OF RECYCLING INDUSTRIES, INC., Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,**

Association of American Railroads, et al., Aluminum Association, Inc., Intervenors.

**NATIONAL ASSOCIATION OF RECYCLING INDUSTRIES, INC., Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,**

Atchison, Topeka and Santa Fe Railway Co., et al., Institute of Scrap Iron and Steel, Inc., National Steel Corporation (79–1582) American Paper Institute, Inc. (79–1590), Intervenors.

Nos. 81–1051, 79–1393, 79–1395, 79–1582, 79–1583, 79–1590, 79–1611, 79–1620, 79–1838, 79–1839, 79–1860, 79–1970 and 79–1984.

United States Court of Appeals, District of Columbia Circuit.

Argued April 27, 1981.

Decided July 15, 1981.

Edward L. Merrigan, Washington, D. C., for petitioner.

Ellen K. Schall, Deputy Associate Gen. Counsel, I. C. C., Washington, D. C., with whom Richard A. Allen, Gen. Counsel and Robert S. Burk, Deputy Gen. Counsel, I. C. C., Washington, D. C., were on the brief, for respondent, Interstate Commerce Commission. John J. Powers, III and Kenneth P. Kolson, Attys., Dept. of Justice, Washington, D. C., entered appearances for respondent, United States of America.

Michael Boudin, Washington, D. C., with whom Timothy A. Harr, James L. Tapley, Washington, D. C., James L. Howe, III, Richmond, Va., Harry N. Babcock, Cleveland, Ohio, Richard W. Kienle, Roanoke, Va., William C. Leiper and John A. Dailey, Philadelphia, Pa., were on the brief for intervenors, Association of American Railroads, et al.

Dickson R. Loos, Washington, D. C., was on the Statement in lieu of brief, for intervenor, Aluminum Association.

Edward L. Merrigan, Washington, D. C., was on the brief for petitioner National Association of Recycling Industries, in case No. 79–1393.

David Reichert, Howard Gould and Stephen D. Strauss, Cincinnati, Ohio, were on the brief, for the petitioner Institute of Scrap Iron and Steel, Inc. in case No. 79–1395.

John F. Donelan, and John K. Maser, III, Washington, D. C., for Armco, Inc., Inland Steel Co., Republic Steel Corp. and Youngstown Sheet and Tube Co., and Engene T. Liipfert, Fritz R. Kahn and L. John Osborn, Washington, D. C., for National Steel Corp. and Paul V. Miller, Bethlehem, Pa., for Bethlehem Steel Corp., were on the joint opening brief, for Armco, Inc., Inland Steel Co., Republic Steel Corp., and Youngstown Sheet and Tube Co. (petitioners in No. 79–1582), and Bethlehem Steel Corp. and National Steel Corp. (intervenors in No. 79–1582).

John F. Donelan, John K. Maser, III, and Renee D. Rysdahl, Washington, D. C., were on the brief, for petitioner American Paper Institute, Inc., in case No. 79–1583.

Michael Boudin, Timothy A. Harr, Washington, D. C., Richard W. Kienle, Roanoke, Va., and John A. Dailey, Philadelphia, Pa., were on the brief, for petitioner Railroads in case No. 79–1590.

Dickson R. Loos, Washington, D. C., were on the brief for petitioner Aluminum Association, Inc., in case No. 79–1611.

C. Michael Loftus, William L. Slover and Donald G. Avrey, Washington, D. C., were on the brief, for petitioner Fort Howard Paper Co., in case No. 79–1620.

Robert N. Kharasch, Edward D. Greenberg, Washington, D. C., was on the brief, for petitioner Southern Paper Traffic Conference in case No. 79–1838, petitioner Southwestern Paper Traffic Conference in case No. 79–1839, petitioner Wisconsin Paper and Pulp Manufacturers Traffic Association in case No. 79–1860, and petitioner Western Paper Traffic Conference in case No. 79–1970.

Michael M. Briley, Louis E. Tosi and Stephen B. Mosier, Toledo, Ohio, were on the brief, for petitioner Glass Packing Institute in case No. 79–1984.

Robert S. Burk, Deputy Gen. Counsel and David Popowski, Atty., I. C. C., Washington, D. C., were on the brief for respondent, ICC. Kenneth G. Caplan and Frederick W. Read, III, Attys., I. C. C., Washington, D. C., also entered appearance for respondent, ICC.

Barry Grossman, John J. Powers, III and Robert Lewis Thompson, Attys., Dept. of Justice, Washington, D. C., were on the brief, for respondent Department of Justice.

Before MacKINNON and WALD, Circuit Judges, and RONALD N. DAVIES *, United States Senior District Judge for the District of North Dakota.

Opinion for the Court filed by Senior District Judge RONALD N. DAVIES.

RONALD N. DAVIES, Senior District Judge:

Presenting a matter of statutory construction, the National Association of Recycling Industries, Inc. (NARI), in its petition for review [1] of a final report and order of the Interstate Commerce Commission (Commission) issued December 30, 1980, *Ex Parte 394*, challenges the Commission finding that Section 204 of the Staggers Rail Act of 1980 [2] is ambiguous.

The Act, signed into law by the President October 14, 1980, was passed by Congress to provide guidelines under which the Commission would develop a new revenue-to-variable [3] cost standard for certain recyclables:

## TRANSPORTATION OF RECYCLABLE MATERIALS

SEC. 204. Section 10731 of title 49, United States Code, is amended by adding at the end thereof the following new subsection:

(e) Notwithstanding any other provision of this title or any other law, within 90 days after the effective date of the Staggers Rail Act of 1980, all rail carriers providing transportation subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title shall take all actions necessary to reduce and thereafter maintain rates for the transportation of recyclable or recycled materials, other than recyclable or recycled iron or steel, at revenue-to-variable cost ratio levels that are equal to or less than the average revenue-to-variable cost ratio that rail carriers would be required to

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. In No. 79–1393, we reviewed a final report and order of the Commission, *Ex Parte No. 319*, and in our decision, *National Ass'n. of Recycling Industries v. I. C. C.*, 627 F.2d 1328 (D.C. Cir.1980), *modified sub nom., Consolidated Rail Corp. v. National Association of Recycling Industries, Inc.*, 449 U.S. 609, 101 S.Ct. 775, 66 L.Ed.2d 776 (1981), we retained jurisdiction and ordered the Commission to comply with Congressional directives by determining a level of reasonableness for rates on recyclables and to define permissible remedies for discrimination. Stressed was "the importance of expedition as mandated by Congress in section 204" of the Railroad Revitalization and Regulatory Reform Act of 1976.

 Motions seeking orders directing the Commission to take affirmative action were filed by the National Association of Recycling Industries, Inc., and jointly by Armco, Inc., Inland Steel Company, Republic Steel Corporation, and Youngstown Steel & Tube Company. To expedite review, we entered an order consolidating No. 79–1393 with No. 81–1051, the instant case. After the motion was filed and our order of consolidation entered the Commission instituted further proceedings in *Ex Parte 319* and urged "the parties to be as helpful as possible in their comments so that we may conclude this proceeding expeditiously." Our consideration of the motions, pending a final report and order by the Commission, would be premature and therefore the motions are denied.

2. Pub.L. 96–448, 94 Stat. 1895, codified 49 U.S.C. § 10731(e).

3. The revenue-to-variable cost ratio is the ratio of the revenue generated by the commodity to a portion of the total cost of carrying the commodity, i. e., those costs that vary with the volume of traffic. Brief of Intervenors, Association of American Railroads, et al., N. at p. 4.

realize, under honest, economical, and efficient management, in order to cover total operating expenses, including depreciation and obsolescence, plus a reasonable and economic profit or return (or both) on capital employed in the business sufficient to attract and retain capital in amounts adequate to provide a sound transportation system in the United States. As long as any such rate equals or exceeds such average revenue-to-variable cost ratio established by the Commission, such rate shall not be required to bear any further rate increase. The Commission shall have jurisdiction to issue all orders necessary to enforce the requirements of this subsection.

On November 18, 1980, a notice was issued by the Commission instituting *Ex Parte 394* for the purpose of establishing an average revenue-to-variable cost ratio. Also requested were comments on the Commission's interpretation of the Act relating to rate reduction requirements:

Section 204 requires the railroads, within 90 days, to take all actions necessary to "reduce and thereafter maintain" rates for recyclables, other than scrap iron and steel, at cost ratio levels equal to or less than the defined average ratio. This wording implies that the carriers are to reduce immediately any above-average recyclable rates.

However, section 204 goes on to state that as long as a rate exceeds the average cost ratio, the rate cannot be increased. This suggests that rates do not have to be decreased immediately. This interpretation is supported by the Joint Explanatory Statement of the Committee of Conference, which states the bill would prohibit increases for rates which are currently above the threshold until such time as the rate falls below the average revenue-to-variable cost threshold.

Because of the legislative history, we are inclined toward the interpretation that immediate reductions are not required. However, we invite the public to comment upon the question.

In its final decision the Commission computed the average revenue-to-variable cost ratio to be 146% and concluded that "rates above the calculated average may not bear any further increases but need not be reduced."

In the present highly inflationary climate, the statutory prohibition against increasing rate levels is equivalent to a substantial constant dollar rate decrease. We conclude that the Congress had inflation in mind as the mechanism by which recyclable rates would be reduced to the threshold level. Rates currently above the threshold will, over time, fall below the average revenue-to-variable cost threshold by virtue of prohibiting increases to such recyclable rates.

We think this interpretation is consistent with what we believe to be major Congressional policy objective of the Staggers Act. The new law is designed to eliminate unnecessary Federal regulation and permit railroad management to improve the revenue position of the railway system by adopting new service and pricing strategies to retain and attract traffic. Requiring rate reductions on such services as transportation of recyclables in an industry that is financially weak would be contrary to this overriding policy objective.

Two of the five Commissioners participating dissented, contending that the Act clearly required rail carriers to immediately reduce and maintain rates equal to or less than 146% and if the reductions were averaged (by commodity and/or geographic level), individual rates would be both above and below 146% and those above would not be required to bear any further increases until they fell below the established ratio.

We are fully aware of the deference due the construction placed on a statute by an agency charged with the responsibility for administering it. *SEC v. Sloan*, 436 U.S. 103, 98 S.Ct. 1702, 56 L.Ed.2d 148 (1978); *Train v. Natural Resources Defense Council*, 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975); *Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). However,

to accord deference is not to abdicate our duty to construe the statute, for "the courts are the final authorities and 'are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute.'" *SEC v. Sloan, supra; Ft. Pierce Utilities Authority v. United States*, 606 F.2d 986 (D.C.Cir. 1979), cert. denied, 444 U.S. 842, 100 S.Ct. 83, 62 L.Ed.2d 54.

In any case concerning the interpretation of a statute the "starting point" must be the language of the statute itself, *Lewis v. United States*, 445 U.S. 55, 100 S.Ct. 915, 63 L.Ed.2d 198 (1980), and it is a fundamental principle of statutory construction that " 'effect must be given, if possible, to every word, clause and sentence of a statute.' . . . so that no part will be inoperative or superfluous, void or insignificant." *In re Surface Min. Regulation Litigation*, 627 F.2d 1346 (D.C.Cir.1980) quoting from 2A Sutherland, Statutory Construction § 46.06.

The first sentence of Section 204(e) is clear, explicit and mandatory. It requires all rail carriers, within 90 days after the effective date[4] of the Act, to "take all actions necessary to reduce and thereafter maintain rates . . . at revenue-to-variable cost ratio levels that are equal to or less than . . ." the average ratio of 146% established by the Commission. If the Commission had so ordered and followed its past practice of requiring rate reductions to be averaged by commodity and/or geographic area,[5] as suggested by the dissenting commissioners, the second sentence becomes equally clear and explicit. Simply stated, it merely prevents any single rate that "equals or exceeds" 146% to be increased until it has gone below that level.

The Commission's interpretation, in contrast, gives unwarranted emphasis to the phrase "equals or exceeds" to justify a strained interpretation resulting in negation of the Congressional mandate contained in the first sentence. This construc-

tion ignores the requirement that every statute must be viewed in its entirety so that each part has a sensible and intelligent effect harmonious with the whole. It is not to be presumed that Congress intended any part of a statute to be without reasonable meaning. *Payne v. Panama Canal Co.*, 607 F.2d 155 (5th Cir. 1979). To interpret Section 204 in the manner suggested by the Commission would render the first sentence not only superfluous but also meaningless in light of what Congress sought to achieve, an immediate reduction in rates. Nor can we countenance the Commission's effort to justify its order by relying on what it believed to be a major Congressional policy objective of the Act. While it is true that its overall purpose is to provide the opportunity for railroads to obtain adequate earnings, it is equally true that Section 204 requires the Commission to enforce its requirements "notwithstanding any other provision of this title or any other law . . . ." Congress deliberately chose to single out recyclable or recycled materials, other than iron or steel, for special treatment and thereby created a specific exemption from the general purpose of the Act.

While we feel that Section 204(e) is free from ambiguity, our interpretation comports with congressional purpose as evidenced in its legislative history. Its predecessor was introduced by NARI during hearings held by the Senate Committee on Commerce, Science and Transportation while considering Senate bill S. 1946, the Railroad Policy Act of 1979. NARI's proposal, with minor changes, was incorporated into the bill:

(e) Not withstanding any other provision of this Act or any other statute, within ninety days after enactment of the Railroad Transportation Policy Act of 1979, all rail carriers subject to jurisdiction of the Interstate Commerce Commission shall take all actions necessary to reduce and thereafter maintain rates for the transportation of recyclable or recy-

---

4. Designated, with certain exceptions, as October 1, 1980.

5. See *National Ass'n. of Recycling Industries v. I.C.C.*, supra, N. 1.

cled materials at revenue-to-variable cost ratio levels that are equal to or less than the average revenue-to-variable cost ratios initially established and thereafter published annually by the Commission pursuant to Section 102 of the Railroad Transportation Policy Act of 1979 and any such rate which equals or exceeds the average revenue-to-variable cost ratio established by the Commission as aforesaid shall not be required to bear any further rate increases. The Interstate Commerce Commission shall have jurisdiction to issue all orders necessary to enforce the requirements of this Subsection.

In its Report on the bill, Sen. Rep. 96–470, 96th Cong., 1st Session (1980), the Committee stated:

The freight rate issue has been a key in legislation attempting to encourage increased recycling as a way to mitigate the problem of energy and resource conservation. Rail freight rates are an important factor in the economics of recycling. Often the rates on these commodities equal or substantially exceed the value of the recyclable materials and thereby make it economically impossible for these materials to be marketed competitively. This is inconsistent with the national interests incorporated in and comprise the focal point of the energy resource legislation described above.

This Committee and Congress, through section 603 of the Regional Rail Reorganization Act of 1973 and section 204 of the 4R Act, issued statutory mandates to the Interstate Commerce Commission to remove all unreasonable, discriminatory freight rates for recyclables. Congress' concern then, as it is now, was with the disparity of rates charged to ship recyclable and competing virgin materials. Unless such rate disparities were cost justified, they were to be eliminated without regard to the railroad's general revenue needs.

The need for this additional legislation arises because the Interstate Commerce Commission initially failed to properly comply with the clear congressional mandates, with the result that its proposed actions were unanimously reversed, vacated and set aside by the United States Court of Appeals in Washington in 1978. [*National Ass'n. of Recycling, etc. v. I.C.C.*, 190 U.S.App.D.C. 118, 585 F.2d 522 (1978), cert. denied, 440 U.S. 929, 99 S.Ct. 1266, 59 L.Ed.2d 485.] In response to the court's remand of (sic) the Interstate Commerce Commission recently proposed to place a "cap" on freight rates for recyclables at 180 percent of variable cost. At the time this "cap" was imposed it exceeded the average revenue/variable cost level for all traffic moving by rail by 53 points, the rebuttable market dominance presumption under the Commission's rules by 20 points and approximately 30 points above the reasonable levels that would be fixed by section 102 of S. 1946. The Committee notes that the Department of Justice, the Department of Energy and the Environmental Protection Agency have all filed briefs in opposition to the ICC's proposed cap. It is therefore the Committee's belief that after a full 6 years since the clear mandate to remove those economic barriers to the promotion of recyclable materials was first issued, it is now necessary to insure reasonable and nondiscriminatory rate levels on these vital commodities by statutory proscription.

The Committee's provision is quite simple: it merely reduces the Commission's cap on recyclables from the 180 percent revenue/variable cost ratio level to the ratio level established by section 102 of S. 1946.

At the estimated level of 140 percent to 160 percent, to be established under this section, the railroads would receive revenues that exceed their variable costs by 40 percent to 60 percent and at that level they should be able to make a profit on this recyclable traffic. At this level, neither the railroads nor any other traffic will be "subsidizing" recyclables. This traffic will be paying its full way—including all costs, plus a reasonable rate of return to the railroads.

It is the Committee's intent that the railroads be afforded their full cost plus a reasonable return on the movement of recyclables and therefore the applicable ratio under this provision will be recomputed by the Commission each year, just as the same ratio is to be recomputed annually under section 102 of the bill. This level, however, will represent a "maximum level of reasonableness" for recyclables, and as long as rates charged for the transportation of these materials of such vital importance to the United States are at this level, there can be no further rate increases above such revenues to variable cost ratios.

It is obvious that the Committee, in adopting Section 204, expected (1) that "within 90 days . . . all rail carriers . . . shall take all action necessary to reduce and thereafter maintain rates . . . at revenue-to-variable cost ratio levels equal to or less than the average revenue-to-variable cost ratio . . .," (2) that the ratio would thereafter be recomputed annually, and (3) that if, in any given year, a rate was equal to or exceeded the recomputed ratio, "such rate shall not be required to bear any further rate increase."

The Senate bill, as amended, was passed by Congress as the Staggers Rail Act of 1980. The most important change in relation to Section 204 was the deletion of the requirement that the revenue-to-variable cost ratio be recomputed annually. No specific reason was given for this action by the Committee of Conference, House Conference House Report No. 96–1430, 96th Cong. 2d Sess. (1980), U.S.Code, Cong. & Admin. News, 1980, pp. 3978, 4128:

Senate bill.—The Senate bill requires that rates for recyclable or recycled materials be no higher than the average revenue to variable cost ratio of all rates for railroad transportation. Any rate which exceeds that threshold shall not be required to bear further rate increases.

House amendment.—No provision.

Conference substitute.—The Conference substitute adopts the Senate bill with certain changes. The substitute ex-

cludes recyclable or recycled iron and steel from this provision. Rates which are currently above the threshold would be prohibited from increases until such time as the rate falls below the average revenue to variable cost threshold. The standard for establishing the average revenue to variable cost threshold is the standard used in the Senate bill.

In response to the Commission's invitation for comments on its proposed interpretation that "immediate reductions are not required," both the House and Senate sponsors of the Act submitted letters in which they, in most emphatic terms, stated that it was the intent of Congress that immediate reductions in rates were required on recyclables and that thereafter the rates were to be maintained below the level established annually by the Commission. While post-passage remarks of legislators cannot serve to change the legislative intent of Congress expressed before the Act's passage, *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974), *post hoc* interpretations by the principal sponsors are entitled to some consideration. *Citizens to Save Spencer Cty. v. U. S. Environ., etc.*, 600 F.2d 844 (D.C.Cir.1979).

The Commission realized that the revenue-to-variable cost ratio would have to be recomputed and so stated in its notice instituting proceedings in *Ex Parte No. 394*:

Although section 204 does not specifically direct the Commission to develop this average ratio, it does state that the Commission shall have jurisdiction to issue all orders necessary to enforce the requirements of the section. The legislative history also indicates that Congress intended the Commission to establish the standard. H.R.Rep.No.96–1430, 96th Cong., 2d Sess. 96 (1980); S.Rep.No.96–470, 96th Cong., 1st Sess. 18–19, 33–34, 51, 61–62 (1979). *We anticipate periodic recalculations of the average ratio.* (Emphasis added.)

The Commission's only error was in not requiring the railroads to immediately reduce rates for the transportation of recyclable or recycled materials to the 146% level.

It necessarily follows that railroads are required to immediately reduce rates and, once this has been accomplished, thereafter maintain rates at levels equal to or less than the ratio level periodically recomputed by the Commission.

We vacate the order entered in *Ex Parte No. 394*, maintain our continuing jurisdiction and remand for immediate action consistent with this opinion.