867 F.2d 1448
 276 U.S.App.D.C. 105
 ALUMINUM COMPANY OF AMERICA, Petitioner,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
The Atchison, Topeka and Santa Fe Railway Company, et al.,
Intervenors.
 No. 88-1241.
 United States Court of Appeals,
District of Columbia Circuit.
Argued Jan. 12, 1989.
Decided Feb. 17, 1989.
 
 Dickson R. Loos, with whom David H. Baker, Washington, D.C., was on the brief, for petitioner.
 Judith A. Albert, Attorney, I.C.C., with whom John J. Powers, III, John P. Fonte, Attorneys, Dept. of Justice, Robert S. Burk, General Counsel, I.C.C., Washington, D.C., and Craig M. Keats, Deputy Associate General Counsel, I.C.C., were on the joint brief, for respondents.
 Richard E. Weicher, Guy Vitello, Chicago, Ill., Louis P. Warchot, San Francisco, Cal., and Joseph Anthofer were on the brief, for intervenors. Robert B. Batchelder, Omaha, Neb., also entered an appearance for intervenors.
 Before SILBERMAN, WILLIAMS and SENTELLE, Circuit Judges.
 Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.
 STEPHEN F. WILLIAMS, Circuit Judge:
 
 
 1
 In 1981 the Interstate Commerce Commission ordered railroads to reduce the rates charged to shippers of nonferrous recyclable materials,[1] pursuant to Sec. 204 of the Staggers Rail Act of 1980, 49 U.S.C. Sec. 10731(e) (1982). For some reason that remains obscure, the railroads never implemented the reductions on recyclables transported in the California intrastate market. In July 1986, after a series of other proceedings, some in district court and some before the ICC, the Aluminum Company of America filed a complaint with the Commission requesting a declaratory judgment that the 1981 rate reduction order applied to California intrastate shipments. In addition, Alcoa asked that the Commission order the railroads to pay what it characterized as "refunds" for any overpayments made in 1981 and 1982.
 
 
 2
 Although the ICC issued the requested declaratory relief, it declined to award Alcoa any recovery for the excess charges of 1981-82. First, it found that the claim was for "damages" rather than for "refunds," and thus governed by 49 U.S.C. Sec. 11706(c)(1)'s two year statute of limitations rather than by 49 U.S.C. Sec. 11706(b)'s three-year limit. Second, it rejected Alcoa's claim that the statute was tolled by the pendency of proceedings that resolved certain ambiguities in the scope of Alcoa's remedy. Thus, even though the Commission assumed that Alcoa's action in district court tolled the statute during the 20 months of its pendency, it found the claim barred as to the 1981 and 1982 shipments. Alcoa appeals the denial of any money recovery. Because we find the Commission's basic analysis to be correct, we in large part affirm.
 
 
 3
 The Commission's arithmetic, however, appears slightly off. If it is proper to toll the statute for the district court action, as the Commission assumed, then a suit filed on July 13, 1986 was in time to catch at least several weeks of shipments at the end of 1982. Accordingly we reverse and remand for the Commission to determine whether Alcoa can recover for shipments made in that period.
 
 
 4
 * * *
 
 
 5
 The facts are important primarily as they relate to the timing of the various proceedings initiated by Alcoa. Accordingly we present them in chronological order.
 
 
 6
 October 1, 1980. The Staggers Rail Act took effect. Sec. 204, 49 U.S.C. Sec. 10731(e),[2] imposed rate limits on carriers transporting nonferrous recyclable materials by rail, to take effect within 90 days of the Act's effective date.
 
 
 7
 December 30, 1980. The ICC first implemented Sec. 204 by establishing as the rate ceiling an average revenue-to-variable cost ratio of 146 percent. Ex Parte No. 394, 364 ICC 425, 426 (1980). As the Commission believed that Congress intended existing rates to come into compliance by the combined force of inflation and limits on railroad rate increases, however, it ordered no rate reductions. Id. at 428.
 
 
 8
 July 15, 1981. This court vacated the ICC's 1980 decision and required the Commission to order immediate reductions of any rates above the 146 percent level. National Ass'n of Recycling Indus., Inc. v. ICC, 660 F.2d 795 (D.C.Cir.1981).
 
 
 9
 September 23, 1981. Complying with this court's mandate, the Commission ordered the railroads to implement rate reductions such that their average rates for the covered recyclables, measured within specific territories, would fall within the 146 percent ratio. This approach enabled the Commission to avoid the complexity of assessing each individual rate. The Commission also ordered refunds for past shipments made after December 30, 1980. Ex Parte No. 394, 365 ICC 304 (1981), aff'd sub nom. Baltimore & Ohio R.R. Co. v. ICC, 684 F.2d 1031 (D.C.Cir.1982) (unpublished judgment).
 
 
 10
 December 26, 1981. The railroads for the most part reduced rates to comply with the prescribed territorial averages. There was, however, some confusion about the applicability of the ICC's 1981 decision to California intrastate shipments. While a December 26, 1981 tariff publication appeared to cover at least some such shipments, a publication issued a month later cancelled that reduction. See Joint Appendix ("J.A.") 54 (statement of Walter A. Notton, Alcoa rail transportation supervisor).
 
 
 11
 December 23, 1982. Alcoa, through a trade association, filed a suit in district court seeking, as to California intrastate shipments of nonferrous recyclables, both prospective enforcement of the ICC's 1981 decision and damages for the railroads' past excess charges. Aluminum Ass'n v. Alton & Southern Ry. Co., No. 82-3639 (D.D.C. filed Dec. 23, 1982); see also 49 U.S.C. Secs. 11705(a), 11705(c)(2) (allowing civil actions to enforce ICC orders); id. at Secs. 11705(b)(2), 11705(c)(1) (allowing civil actions to recover damages sustained for illegal acts or omissions of a carrier).
 
 
 12
 July 11, 1983. The ICC finished its evaluation of the railroads' compliance with the territorial rate reductions and found them generally in accord with its 1981 decision. Ex Parte No. 394, 367 ICC 623, 626-32, 636 (1983). It also set the stage for a second level of compliance, construing the Staggers Act to allow shipper complaints attacking particular rates that were above the 146 percent cap even though the carrier's rates conformed on average to the 146 percent limit. Id. at 632-35.
 
 
 13
 August 21, 1984. The district court dismissed Alcoa's civil complaint. Aluminum Ass'n v. Alton & Southern Ry. Co., No. 82-3639 (D.D.C. Aug. 21, 1984) (Order Dismissing Amended Complaint). The court primarily addressed Alcoa's claims that it should enforce the Commission's 1981 decision, pursuant to 49 U.S.C. Sec. 11705(a) or id. at Sec. 11705(c)(2), but decided that the order was not yet judicially enforceable as to California intrastate shipments because the ICC had not made clear whether it covered them. Because the Commission itself was authorized to award complete relief, the court did not retain jurisdiction but rather dismissed the action "without prejudice to plaintiffs' right to pursue their administrative remedies at the Interstate Commerce Commission." Aluminum Ass'n v. Alton & Southern Ry. Co., at 9-10.
 
 
 14
 Though noting Alcoa's claims for reparations or damages, id. at 2, the court did not treat them separately from its disposition of the claims framed as requests for enforcement of the 1981 Commission order.
 
 
 15
 July 19, 1985. This court reversed the ICC's 1983 decision to the extent that it authorized challenges to particular rates, finding that Sec. 204 contemplated only aggregate rate reductions of the type ordered by the ICC in 1981. Norfolk & Western Ry. Co. v. United States, 768 F.2d 373 (D.C.Cir.1985), cert. denied sub nom. Aluminum Ass'n v. Norfolk & Western Ry. Co., 479 U.S. 882, 107 S.Ct. 270, 93 L.Ed.2d 247 (1986).
 
 
 16
 July 13, 1986. Alcoa filed a complaint with the ICC requesting that it order rail carriers to reduce the rates for recyclables shipped in the California intrastate market, pursuant to the 1981 decision. See J.A. at 8-13 (complaint). Alcoa also sought recovery, with interest, for any excess charges it had paid in 1981 and 1982.
 
 
 17
 January 28, 1988. The ICC decided Alcoa's 1986 claim, holding that its 1981 decision encompassed California intrastate shipments and granting Alcoa prospective relief. But the Commission denied Alcoa's claim for recovery of excessive payments made in 1981 and 1982, finding it time-barred. Aluminum Co. of America v. Atchison, Topeka & Santa Fe Ry. Co., No. 40112, slip op. (ICC Jan. 28, 1988) ("Alcoa v. ATSF ").
 
 Standard of Review
 
 18
 Typically this court's review of agency decisions is governed by the deferential standard articulated in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-45, 104 S.Ct. 2778, 2781-83, 81 L.Ed.2d 694, reh'g denied, 468 U.S. 1227, 105 S.Ct. 28, 82 L.Ed.2d 921 (1984). See, e.g., Lo Shippers Action Comm. v. ICC, 857 F.2d 802, 807 (D.C.Cir.1988) (applying Chevron when reviewing an ICC order), petition for cert. pending, 57 U.S.L.W. 3590 (U.S. Mar. 7, 1989). Yet in its brief the ICC did not claim the benefit of such deference. At oral argument counsel for the Commission indicated that the failure to cite Chevron was an oversight but offered no analysis on the question. We note that our recent decision in Atchison, Topeka & Santa Fe Ry. Co. v. ICC, 851 F.2d 1432 (D.C.Cir.1988), resolves a legal issue under the very statute in question here, 49 U.S.C. Sec. 11706, without considering deference to the Commission; the briefs make clear that there too the Commission invoked no claim to deference.
 
 
 19
 It may be that no deference is due Commission interpretations of Sec. 11706 because it governs not only claims before the Commission but also ones that may be brought only before a district court. Sec. 11706(e), for instance, provides a two-year limit for civil actions to enforce a Commission order for the payment of money. Thus Congress can hardly be said to have expressly or impliedly delegated the authority to interpret Sec. 11706 to the Commission. Compare Chevron, 467 U.S. at 844-45, 104 S.Ct. at 2782-83 (resting deference on express or implied delegation); Railway Labor Executives' Ass'n v. ICC, 859 F.2d 996, 998-99 (D.C.Cir.1988) (Chevron deference appropriate when Congress committed the scope of specific provision to ICC determination).
 
 
 20
 On the other hand, an apparent gap in the statute seems to mar the case against deference. Although an action to recover damages sustained as a result of an illegal action or omission by a carrier may be brought before either a district court or the Commission, 49 U.S.C. Secs. 11705(b)(2), 11705(c)(1), the two-year limitations provision relevant here applies only to those actions initiated with the agency, 49 U.S.C. Sec. 11706(c)(1), and does not cover the parallel civil actions in the district court. The parties have not identified any subsection covering those claims.
 
 
 21
 In any event, as we believe the Commission's reading of Sec. 11706(c)(1) to be correct without regard to the scope of review, we need not resolve the dilemma.
 
 
 22
 Identifying the applicable limitations period; is Alcoa seeking a "refund" or "damages"?
 
 
 23
 The ICC classified Alcoa's claim as one for "damages" under 49 U.S.C. Sec. 11705(b)(2), which renders any regulated rail carrier "liable for damages sustained by a person as a result of an act or omission of that carrier in violation of this subtitle." Such claims are governed by Sec. 11706(c)(1)'s two-year statute of limitations. The Commission rejected Alcoa's contention that its claim was for a refund under Sec. 11705(b)(1), which would be governed by Sec. 11706(b)'s three-year limit.
 
 
 24
 Alcoa's proposed avenue for recovery, Sec. 11705(b)(1), does not in fact use the term "refund." It creates liability for "amounts charged that exceed the applicable rate for transportation or service contained in a tariff." But courts and the agency use the term to describe Sec. 11705(b)(1) claims. InAlabama Power Co. v. ICC, 852 F.2d 1361, 1372 n. 19 (D.C.Cir.1988), this court drew the distinction between claims under (b)(1) and (b)(2) of Sec. 11705 as being between "refunds of overcharges--i.e., charges exceeding the amount specified in the applicable tariff" [ (b)(1) ] and "damages ... for rates charged pursuant to unlawful tariffs" [ (b)(2) ].[3] See also S.S. Kresge Co. v. A & B Transfer, Inc., 488 F.2d 894, 897 n. 1 (6th Cir.1973) (Miller, J., dissenting on other grounds), cert. denied, 415 U.S. 960, 94 S.Ct. 1491, 39 L.Ed.2d 575 (1974).
 
 
 25
 It seems quite plain that Alcoa's claim is properly under (b)(2) and not (b)(1). It rests on an assertion that the tariffs governing recyclables in the California intrastate market in 1981-82 violated Sec. 204 of the Staggers Act, not that the railroads charged rates in excess of the filed tariffs.
 
 
 26
 Is the statute tolled for the pendency of litigation over the scope of the remedy?
 
 
 27
 A claim for damages accrues upon delivery by the carrier. 49 U.S.C. Sec. 11706(g). Accordingly, unless Alcoa can establish some basis for tolling, in addition to the 20-month period assumed by the Commission for the district court litigation, all but the last few weeks of its 1981-82 claims are barred.
 
 
 28
 Alcoa's theory is that the statute could not start running until July 19, 1985, when this court, in Norfolk & Western, resolved the question of remedies for violations of Sec. 204. Norfolk & Western held that shippers could recover only charges exceeding the 146 percent ratio as measured on an average territorial basis, not those over 146 percent as measured on any specific rate. (Technically, of course, the remedy issue was not clear until the time for petitioning the Supreme Court for certiorari expired, but the point makes no difference under our view of Alcoa's basic argument.)
 
 
 29
 In its brief and at oral argument, Alcoa sought to shore up this theory by observing that before Norfolk & Western it would have had to prepare and submit not only evidence about territorial average rates (which would entail mere arithmetic), but also evidence about individual rates (which would necessitate hiring a cost consultant). Waiting until the resolution of Norfolk & Western could save the latter costs. In response to a question from the bench as to whether Alcoa could have asked the ICC to suspend damages proceedings once its claim was filed, counsel said that his experience led him to believe that the Commission would likely reject such a request.
 
 
 30
 Alcoa's theory cannot possibly survive this court's recent decision in Atchison, Topeka & Santa Fe Ry. Co. v. ICC, 851 F.2d 1432 (D.C.Cir.1988). There we rejected a Commission decision to toll Sec. 11706 under far more inviting circumstances. One specific class of nonferrous recyclables, automobile shredder residue, had not been subject to the territorial average rate ceiling, evidently because of the absence of adequate data. See id. at 1434. From 1981 to 1986 shippers of the residue were uncertain whether they could be eligible for any relief--the remaining possibility being relief on an individual rate basis. This was finally resolved by the ICC, affirmatively, in July 1986. While we assumed that Sec. 11706 might permit equitable tolling, and that such tolling might be applicable if "shippers lacked notice that they had potential individual refund claims," id. at 1439 (emphasis added), we found that the doubts over relief for shredder residue never approached the requisite level. Rather, the July 1986 decision was merely "the denouement of an unfolding saga." Id. at 1437. The dispute was, we said,
 
 
 31
 the stuff that adjudications are made of: the law is unclear; opposing parties mount reasonable arguments on both sides; the adjudicator says what the law is.
 
 
 32
 Id.
 
 
 33
 Alcoa's uncertainty seems trivial in comparison to that which faced the shippers of shredder residue. The uncertainty as to remedy did not at all draw in question its right to some relief. The risk of wasting resources preparing data for the individual rate claims was of course a real one, but Alcoa, instead of placing its dilemma before the Commission and asking for fit procedures, simply delayed filing.
 
 
 34
 If we treat the claim for relief on a territorial average basis as constituting a different cause of action from individual rate relief, Alcoa's position is even weaker. Uncertainty as to the latter would not justify delay in bringing the former--the only claims that the substantive law, as now clarified, affords.
 
 Residual theories
 
 35
 First, Alcoa appears to argue that any action involving Sec. 204 is not subject to the statute of limitations governing claims arising from the ICC regulatory scheme. See Reply Brief of Petitioner 1-2. We can detect no basis for this argument. The two-year bar of Sec. 11706(c)(1) applies to claims under Sec. 11705(b)(2), which renders carriers subject to Commission jurisdiction "under subchapter I or III of chapter 105 of this title" liable for any damages that result from "an act or omission of that carrier in violation of this subtitle." See 49 U.S.C. Secs. 10501-05 (subchapter I of chapter 105, defining ICC jurisdiction over "Rail, Rail-Water, Express, and Pipeline Carrier Transportation"). The language in Sec. 204 conferring jurisdiction on the ICC "to issue all orders necessary to enforce the requirements of this subsection" does not override the limitations provision; it merely establishes a standard to govern nonferrous recyclable rates and gives the ICC enforcement authority. That general enforcement authority is subject to the procedural rules governing claims under other statutory standards.
 
 
 36
 Second, Alcoa seeks variously to characterize its ICC claim either as one to enforce an order of the ICC for the payment of money under 49 U.S.C. Sec. 11705(c)(2) or as an adjunct to its 1982-84 enforcement action in the district court. The first is self-evidently not true; the only decision here under review is the Commission 's January 1988 order. The fate of any efforts by Alcoa to enforce that in district court is not before us.
 
 
 37
 While Alcoa's characterization of the ICC proceeding as an adjunct to its dismissed district court action may be valid, the point is also not before us. Indeed, the district court's disposition relied on uncertainty over an issue that the ICC's 1988 decision resolved--whether California intrastate shipments were subject to the territorial average rate reductions. But the Commission has given Alcoa no cause for complaint as to the district court action. It explicitly adopted no position on the subject, observing that "our decision does not address whether the District Court should or will in fact award relief, should the case be re-filed there." Alcoa v. ATSF, slip op. at 9 n. 11. Thus neither the decision under review nor our disposition of this appeal prohibits Alcoa from seeking to restart its old suit or from initiating a new district court action.
 
 
 38
 As noted above, the Commission's arithmetic seems to us inaccurate. On the Commission's assumption that the district court action suspended the running of the statute for its 20-month duration (strictly speaking, 19 months and 29 days), the statute would not seem to bar Alcoa's claims for shipments delivered by the railroads on or after approximately November 15, 1982. Neither the Commission nor Alcoa has briefed the theory underlying the 20-month tolling. Thus, while affirming the Commission's general disposition of Alcoa's claim, we remand the case to the Commission for such further proceedings as may be appropriate.
 
 
 39
 So ordered.
 
 
 
 [1]
 The ICC defines "nonferrous recyclables" to include all recyclable or recycled materials covered by Sec. 204 of the Staggers Rail Act, 49 U.S.C. Sec. 10731(e). The term primarily covers those materials which may contain iron but which are not classified as scrap iron or steel. See Ex Parte No. 394, 365 ICC 304, 305 n. 3 (1981)
 
 
 [2]
 In its entirety, 49 U.S.C. Sec. 10731(e) states:
 Notwithstanding any other provision of this title or any other law, within 90 days after the effective date of the Staggers Rail Act of 1980, all rail carriers providing transportation subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title [regulating railroads] shall take all actions necessary to reduce and thereafter maintain rates for the transportation of recyclable or recycled materials, other than recyclable or recycled iron or steel, at revenue-to-variable cost ratio levels that are equal to or less than the average revenue-to-variable cost ratio that rail carriers would be required to realize, under honest, economical, and efficient management, in order to cover total operating expenses, including depreciation and obsolescence, plus a reasonable and economic profit or return (or both) on capital employed in the business sufficient to attract and retain capital in amounts adequate to provide a sound transportation system in the United States. As long as any such rate equals or exceeds such average revenue-to-variable cost ratio established by the Commission, such rate shall not be required to bear any further rate increase. The Commission shall have jurisdiction to issue all orders necessary to enforce the requirements of this subsection.
 
 
 [3]
 Alabama Power also identified as refunds certain other claims that are not remotely relevant here. See 852 F.2d at 1372 n. 19