The **ALUMINUM ASSOCIATION, INC.,** et al., Plaintiffs,

v.

The **ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY,** et al., Defendants.

Civ. A. No. 89–0291(HHG).

United States District Court, District of Columbia.

Sept. 17, 1990.

Dickson R. Loos, David H. Baker, Mitchell H. Stabbe, Holland & Knight, Washington, D.C., for plaintiffs.

J. Michael Hemmer, Richard G. Slattery, Covington & Burling, Washington, D.C. (Guy Vitello, Atchison, Topeka & Santa Fe Ry. Co., Chicago, Ill., Louis P. Warchot, Southern Pacific Transp. Co., San Francisco, Cal., Joseph D. Anthofer, Union Pacific R. Co., Omaha, Neb., of counsel), for defendants.

## MEMORANDUM

HAROLD H. GREENE, District Judge.

Before the Court are defendants' motion to dismiss and plaintiffs' motion for partial summary judgment in a long-running dispute over plaintiffs' claims to refunds for excess payments on rail shipments of scrap aluminum within California in 1981 and 1982. For the reasons stated below, the Court will deny plaintiffs' motion for partial summary judgment and grant defendants' motion to dismiss.

I

In this action, plaintiffs seek to enforce a 1981 order issued by the Interstate Commerce Commission pursuant to section 204 of the Staggers Rail Act of 1980, 49 U.S.C. § 10731(e).[1] See Ex Parte 394, 365 ICC 304 (1981), served October 13, 1981. This order required the railroads to implement rate reductions for transportation of nonferrous recyclable materials such that the average rates, measured within three specific territories (East, South and West) and according to specific classes of recyclables, would fall within a 146 percent revenue-to-variable cost ratio.[2] The order also required the carriers to make reparations or refunds[3] for shipments made after December 30, 1980.[4] During 1981 and 1982, the

---

**1.** This section required the Interstate Commerce Commission to reduce and thereafter maintain rates for the transportation of recyclables other than iron or steel, at revenue-to-variable cost ratio levels that are no higher than necessary to maintain adequate railroad revenues and preserve an economically sound railroad system. See 49 U.S.C. § 10731(e).

**2.** According to the plaintiffs, the aggregate rate reduction figure established for the Western territory for aluminum scrap—the figure plaintiffs argue should apply to California intrastate shipments—was 12.6%. See Affidavit of J. Robert Hoon, attached to plaintiffs' motion for partial summary judgment.

**3.** Although plaintiffs have described this aspect of the 1981 order as a "refund" provision, according to the ICC, the order was more in the nature of a "reparations" order directed at remedying the collection of applicable rates that were above a reasonable level. See Aluminum Co. of America v. The Atchison, Topeka and Sante Fe Ry. Co., No. 40112, slip op. at 1, note 3 (ICC Jan. 28, 1988) ("1988 order"). According to the ICC, a refund order technically results from the collection of overcharges, which are defined as charges higher than those permitted by the applicable tariff. Id. As explained at note 11, infra, the distinction between these two types of orders affects the statutory section under which a shipper can pursue remedies.

**4.** The ICC had issued an order the year before which had set this 146 percent ratio as the rate ceiling. Ex Parte No. 394, 364 ICC 425 (1980).

railroads reduced their rates to comply with the prescribed territorial averages, and, following an unsuccessful appeal of the portion of the order mandating refunds,[5] the railroads began to issue refunds as well.

There was, however, some ambiguity as to the applicability of the 1981 order to California intrastate shipments. At the time the 1981 ICC order was issued, California was one of a few states which had not requested certification to regulate its own intrastate shipments,[6] and it was unclear whether or not such states would automatically be subject to ICC regulation. Ultimately California informed the ICC that it did in fact want its intrastate rail services to be regulated by the ICC according to federal standards, and on May 11, 1982, the ICC issued a decision in which it formally assumed jurisdiction over California intrastate rail service. *See* 1988 Order, slip op. at 5 (ICC Jan. 28, 1988). Neither before nor after the ICC formally assumed jurisdiction over the California intrastate market did the railroads reduce rates or issue refunds with respect to this market.

From 1982 to 1983, the ICC conducted proceedings to evaluate whether or not the carriers were in compliance with the 1981 order. In July of 1983, the Commission issued an order in which it concluded that the carriers were in compliance with the territorial averages established by the 1981 order.[7] The degree to which plaintiffs participated in those proceedings is unclear, but one thing is clear—they did not raise the question of carrier compliance with the 1981 order in the California intrastate market. Instead, in December of 1982, plaintiff Aluminum Company of America (Alcoa), through a trade association, filed suit in District Court seeking prospective enforcement of the 1981 order with respect to the California intrastate shipments, as well as damages for the railroads' past excess charges in that market. In 1984, the court determined that plaintiff's claim did not state a claim upon which relief could be granted because it was not supported by a specific and definitive ICC order which expressly required the railroads to make reductions or refunds as to California intrastate rates. *See Aluminum Ass'n v. Alton & Southern Ry. Co.*, Civ. No. 82–3639 (D.D.C. Aug. 21, 1984), at 5–7.[8] The court

However, at that time, the Commission ordered no rate reductions on the theory that existing rates could come into compliance through a combination of the effect of inflation and the limits on rate increases. In July of 1981, the Court of Appeals vacated the ICC's 1980 decision and required the Commission to order immediate reductions of any rates above the 146 percent level on a territorial basis. *National Ass'n of Recycling Indus., Inc. v. ICC*, 660 F.2d 795 (D.C.Cir.1981).

**5.** *See Baltimore & Ohio R.R. Co. v. ICC*, 684 F.2d 1031 (D.C.Cir.1982) (unpublished judgment), attached to plaintiffs' motion for partial summary judgment.

**6.** Under section 204 of the Staggers Act, states could regulate intrastate rail transportation only if they obtained certification. 49 U.S.C. § 11501(b)(4)(B).

**7.** *Ex Parte No. 394*, 367 ICC 623 (1983). This order also construed the Staggers Act as permitting the ICC to entertain complaints attacking particular rates that remained above the 146 percent cap, even though the carriers' rates conformed to this ratio on a territorial basis. However, the railroads challenged the ICC's authority to accept complaints on an individual basis,

and in 1985 the Court of Appeals reversed the 1983 ICC decision, finding that section 204 of the Staggers Act only contemplated aggregate rate reductions, such as those ordered by the ICC in 1981. *Norfolk & Western Ry. Co. v. United States*, 768 F.2d 373 (D.C.Cir.1985), *cert. denied sub nom., Aluminum Ass'n v. Norfolk & Western Ry. Co.*, 479 U.S. 882, 107 S.Ct. 270, 93 L.Ed.2d 247 (1986).

**8.** Alcoa also pursued a second claim in the District Court which is not at issue here, in which it argued that despite the implementation of interstate rate reductions on a territorial basis, individual interstate rates still remained above the 146 percent national average. However, because no precise figures of monetary liability had been calculated with regard to particular carriers, the court determined that the 1981 order failed to constitute an order for the payment of money appropriate for judicial enforcement. The court also concluded that because the individual claims plaintiffs sought to bring to the court were precisely the kind of claims that could be filed with the Commission in accordance with its 1983 compliance order (*see* note 7, *supra*), relief could and should be obtained from the Commission. Consequently, the court dismissed this aspect of the claim as well.

also concluded that because the ICC had the power under the Staggers Act to clarify obligations under prior orders, as well as to order refunds and future rate reductions, there existed adequate and sufficient agency remedies to which the plaintiffs must first resort. *Id.* at 4. For these reasons, the court dismissed the action, but "without prejudice to plaintiffs' right to pursue their administrative remedies at the Interstate Commerce Commission." *Id.* at 9–10. In so doing, the court noted that in the event that the plaintiffs obtained a specific and definitive order addressed to California intrastate rates and refunds, which the railroads then disobeyed, "judicial enforcement might well be appropriate." *Id.* at 7, note 12.

In July of 1986—almost two years after the District Court had dismissed the case—Alcoa filed a complaint with the ICC "against unreasonable rates on non-ferrous recyclables commodities and for refunds," in the California intrastate market.[9] As one of many alternative prayers for relief, the complaint requested that, pursuant to the 12.6% reduction rate established for scrap aluminum in the Western territory, the Commission order the California intrastate rates for such shipments to be reduced by that figure as well, and that the difference between that amount and the amount paid be refunded.

In January of 1988, the ICC held that, due to "the overriding Congressional intent [to apply] federal law and ICC standards," its 1981 order did in fact encompass California intrastate shipments, and on that basis the Commission granted Alcoa's request for prospective rate reductions. *Aluminum Co. of America v. Atchison, Topeka & Santa Fe Ry. Co.,* No. 40112, slip op. (ICC January 28, 1988) at 5–6. At the same time, however, the Commission denied Alcoa's claim for any damages due to unreasonable rates paid in 1981 and 1982[10] on the ground that this claim was untimely under the two year statute of limitations for damage actions.[11] Alcoa appealed the ICC's order, and in February of 1989, the Court of Appeals affirmed the decision. *See Aluminum Co. of America v. United States,* 867 F.2d 1448 (D.C.Cir. 1989).

Shortly before the Court of Appeals' decision was issued, and exactly one year after the ICC issued its 1988 order, Alcoa filed the instant lawsuit in which it seeks the relief it was denied by the District Court in 1984, as well as by the ICC in 1988. For the reasons explained below, the Court finds that the action must be dismissed.

## II

The Staggers Act specifically empowers both the ICC and District Courts to entertain complaints for reparations or damages as a result of illegal acts or omissions of a carrier's actions pursuant to 49 U.S.C. § 11705(b)(2), as well as "overcharge" complaints for charges which exceed an amount specified in a particular tariff pursuant to 49 U.S.C. § 11705(b)(1). The Act also provides federal courts with jurisdiction to enforce ICC orders for the payment of money. 49 U.S.C. § 11705(c)(2). It is clear that, having already adjudicated any

---

**9.** *See* Exhibit J of Defendants' Motion to Dismiss.

**10.** Plaintiffs were then (as they are now) pursuing their claim with respect to shipments moved in 1981 and 1982 because, as of 1983, they diverted shipments to other modes or entered into contracts significantly below the tariff rates. *See* Plaintiffs' Reply in Opposition to Motion to Dismiss, note 6.

**11.** In coming to this conclusion, the ICC rejected Alcoa's argument that its claim was an overcharge claim under subsection (b)(1) of 49 U.S.C. § 11705, which is subject to a three year statute of limitations period under 49 U.S.C. § 11706(b), and held that, as a request for an

award of monetary relief, the claim constituted a complaint for damages pursuant to subsection (b)(2) of section 11705, which is subject to the two year limitations period of section 11706(c). *Id.,* at 6.

The ICC also rejected plaintiffs' theory that the statute of limitations period should be tolled during the carriers' appeal of the 1983 ICC order, and its ultimate resolution by the Court of Appeals in *Norfolk, id.* at note 7, on the ground that the question of individual rate claims was a separate issue from applicability of the 1981 order to California intrastate rates. *See* 1988 order at 7.

damages claim for the California intrastate shipments before the ICC in 1986, plaintiffs cannot now bring a damages action pursuant to section 11705(b)(2) before this Court, and plaintiffs do not contend otherwise.[12]

Instead, plaintiffs have styled their claim as an action for the enforcement of an order for the payment of money pursuant to section 11705(c)(2). In essence, plaintiffs argue that the 1981 order required refunds; that this order was an order for the payment of money enforceable in court pursuant to 49 U.S.C. § 11705(c)(2); that the 1981 order became enforceable as to California intrastate rates in January of 1988 when the ICC declared that the 1981 order did in fact encompass California intrastate shipments; and that by filing their action within one year of the ICC's 1988 order, they have complied with the one year statute of limitations applicable to civil enforcement actions pursued under section 11705(c)(2). *See* 49 U.S.C. § 11706(e). According to plaintiffs, their claim is supported by the fact that, despite its denial of the damages claim in 1988, the ICC stated that its decision left Alcoa free to use the declaratory ruling regarding California intrastate rates "in any manner it deems appropriate in its District Court proceeding...." *See* 1988 Order, *id.*, at 6.

Plaintiffs certainly deserve credit for the creativity involved in their effort to glue different aspects of the 1981 and 1988 orders together, and parade the result as an enforceable order for the payment of money.[13] There are, however, two interrelated problems which plaintiffs face. The first is that they have not overcome the hurdle they confronted in their first visit to District Court, that is, the lack of a specific and definitive ICC order for the payment of money for shipments conducted in the Cali-

fornia intrastate market. The second is that even if the 1981 order could somehow be construed as an enforceable monetary order with respect to the California intrastate market, enforcing it now, six and seven years after the shipments took place, would defeat the statute of limitations applicable to the type of relief sought here.

Plaintiffs assume that the 1981 ICC order was an enforceable order for the payment of money with respect to interstate rates. There is, however, reason to doubt this assumption. The enforcement section for such actions provides as follows:

> The person for whose benefit an order of the Commission requiring the payment of money is made may bring a civil action to enforce that order ... if the carrier does not pay the amount awarded by the date payment was ordered to be made. 49 U.S.C. § 11705(c)(2).

As the District Court explained in its 1984 decision, this section contemplates a specific and definitive obligation, which specifies "by and to whom payments are to be made and in what amounts...." *Id.* at 8. Enforceable ICC orders for the payment of money under this section have been analogized to money judgments, usually, although not always,[14] arising from a complaint for damage suits or excess payment suits brought before the ICC. *See Carothers v. Western Transp. Co.*, 554 F.2d 799, 802 (7th Cir.1977). In other cases, it has been determined that the amount to be paid must be "a sum certain or a sum readily calculable." *Emeryville Trucking, Inc. v. Hennis Freight Lines, Inc.*, 574 F.2d 152, 155 (3d Cir.1978). Given that the 1981 order never specified any amounts to be awarded with respect to interstate rates, and that it was only after the order was issued that the percentage figures for reductions in the three territories were estab-

---

12. Such a preclusion is supported both by the doctrine of res judicata, *see National Classification Committee v. United States*, 765 F.2d 164, 169 (D.C.Cir.1985); *Western Electric Co. v. Burlington Truck Lines, Inc.*, 501 F.2d 928 (8th Cir. 1974), as well as the doctrine of the election of remedies. *See Southern Pacific Transportation Co. v. San Antonio, Tex.*, 748 F.2d 266, note 11 (5th Cir.1984).

13. It is this creativity that had earlier led the Court to confuse the two orders in the prior opinion issued in this case and subsequently stricken.

14. *See*, for example, *Aluminum Co. of Am. v. Admiral Merchants Motor Freight Inc.*, 486 F.2d 717 (7th Cir.1973), and *Container Corp. of Am. v. Admiral Merchants Motor Freight, Inc.*, 489 F.2d 825 (7th Cir.1973).

lished, there is reason to doubt that the plaintiffs could have enforced the 1981 order with respect to interstate rates and refunds, had they sought to do so.[15]

Yet, whatever these defects may have been, the primary defect in the order for present purposes was the one identified by the District Court in 1984—that the order did not establish a specific and definitive monetary obligation with respect to California intrastate rates. For this reason, the plaintiffs were told to bring their complaint to the Commission. The court assumed that plaintiffs would be able to obtain the monetary relief they sought there, and, had they brought their complaint to the Commission in a timely fashion, it may be that relief would have been forthcoming. Finally, as noted at p. 210, *supra*, the court assumed that if the plaintiffs obtained a monetary award with respect to California intrastate rates, and the railroad companies thereafter failed to meet the obligation established by that order, the court would have jurisdiction to enforce the award.

The problem is that, while the plaintiffs obtained an order for prospective relief, the Commission failed at the time to grant them the monetary award necessary to create an enforceable order for the payment of money. The Commission did grant Alcoa's request for inclusion of the California intrastate rates in 1988, and plaintiffs argue that not until then could they bring the instant action. In effect, therefore, plaintiffs' strategy now is to use the declaratory aspect of the 1988 ICC ruling as an order of clarification, which can in turn generate monetary relief with respect to California intrastate shipments made many years ago. According to plaintiffs, there is no statute of limitations obstacle to such a strategy.[16] This Court disagrees, for plaintiffs were responsible for the long delays prior to the 1988 ICC ruling.

■ Plaintiffs are correct that the Staggers Act does not specify a statute of limitations period for seeking orders of clarification from the ICC. However, this does not mean that declaratory orders may be sought years after shipments have been made, and then used to acquire monetary relief. In the view of the Court, when the effect of a clarifying order is to generate a damages award, the statute of limitations period applicable to damages actions must be applied.[17] Any other procedure would defeat that same statute of limitations requirement.

■ Pursuant to 49 U.S.C. § 11706(c)(1), this period is two years, and begins to run on the date of delivery or tender of delivery by the carrier. *See* 49 U.S.C. § 11706. As the ICC has already held, plaintiffs did not bring their complaint to the Commission within that time period.[18] Thus, even if the 1981 order was

---

15. Indeed, when plaintiffs sought to "enforce" the 1981 ICC order, the District Court termed the relief they sought "damages."

16. *See* Plaintiffs' Motion for Partial Summary Judgment at 10.

17. Although the ICC did not decide the issue, it suggested this possibility in its 1988 decision, stating that when a party obtains a declaratory order that a lower rate should have been applied to past shipments, it "may well be barred from obtaining relief as to shipments that moved more than 2 years before a complaint has been filed." 1988 Order at note 11.

18. *See* the ICC 1988 order, pp. 6–8, and note 11, *supra*. The statute of limitations analysis used by the Commission was carefully considered by the Court of Appeals and affirmed without any deference to the agency. *See Aluminum Co. of America v. U.S.*, 867 F.2d 1448, 1452–1453. The Court will therefore not revisit the issue.

While there appears to be no parallel statute of limitations period for damages actions brought in District Court pursuant to section 11705(b)(2), *see Aluminum Co. of America v. U.S.*, 867 F.2d at 1452, it is apparent from a reading of the statute that Congress intended the statute of limitations periods to be the same for the same type of actions, regardless of whether they are brought before a district court or the Commission. For example, actions for overcharges are subject to a three year statute of limitations period regardless of whether they are brought before the Commission or the courts. *See* 49 U.S.C. § 11706(b). Similarly, civil actions for damages pursuant to section 11705(b)(3), like damages actions brought before the Commission under section 11705(b)(2), are subject to a two year statute of limitation.

Thus, even if the time period for seeking an order of clarification from the Commission that was to be injected into a prior Commission order for the payment of money, were for some reason to be calculated according to the statute

an order for the payment of money, enforceable upon receipt of an order from the ICC which clarified the California intrastate issue, the plaintiffs' claim is now time-barred because they did not seek clarification from the ICC within the applicable statute of limitations period.

Accordingly, the Court will grant defendants' motion to dismiss and deny plaintiffs' motion for partial summary judgment.

of limitations period applicable to damage actions brought in District Court, the outcome would be the same.