# United States Court of Appeals
## For the First Circuit

No. 99-2016

PEJEPSCOT INDUSTRIAL PARK, INC. d/b/a GRIMMEL INDUSTRIES,

Plaintiff, Appellant,

v.

MAINE CENTRAL RAILROAD CO., SPRINGFIELD TERMINAL RAILWAY CO.,
GUILFORD TRANSPORTATION INDUSTRIES, INC.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Gene Carter, U.S. District Judge]

Before

Stahl, Circuit Judge,
Bownes, Senior Circuit Judge,
and Lynch, Circuit Judge.

James T. Kilbreth, with whom Rita H. Logan and Verrill & Dana, LLP
were on brief, for appellant.
Eric L. Hirschhorn, with whom Winston & Strawn, Glen L. Porter,
Thad B. Zmistowski, and Eaton, Peabody, Bradford & Veague, P.A. were on
brief, for appellee.

June 23, 2000

**LYNCH, Circuit Judge**. In 1995, Congress enacted the ICC Termination Act (ICCTA),[1] which abolished the 108-year-old Interstate Commerce Commission and substantially deregulated the rail and motor carrier industries. See H.R. Rep. No. 104-311, at 82 (1995), reprinted in 1995 U.S.C.C.A.N. 793, 793. In the ICC's place, the ICCTA established the Surface Transportation Board (STB) within the Department of Transportation. See 49 U.S.C. § 701(a).

The central question in this case is whether the federal district courts have jurisdiction over a shipper's claim that a rail carrier has violated the ICCTA provision that requires carriers to provide service upon reasonable request. See 49 U.S.C. § 11101(a) ("A rail carrier providing transportation or service subject to the jurisdiction of the [STB] under this part shall provide the transportation or service on reasonable request."). The district court held that the STB's jurisdiction over such claims is exclusive, and thus the federal courts have no jurisdiction, except to enforce certain orders issued by the STB. See Pejepscot Indus. Park, Inc. v. Maine Cent. R.R. Co., 59 F. Supp. 2d 109, 114-15 (1999). Accordingly, the court dismissed with prejudice the shipper's ICCTA claim for lack of subject matter jurisdiction and declined to exercise supplemental

_____

[1] Pub. L. No. 104-88, 109 Stat. 803 (codified at scattered sections of U.S.C., including 49 U.S.C. §§ 10101-16106).

-2-

jurisdiction over its state law claims. See id. at 115. We hold that the district court has subject matter jurisdiction over the shipper's ICCTA claim, and that it should stay that claim while referring it to the STB under the doctrine of primary jurisdiction.

## I.

For the purpose of determining whether the district court has subject matter jurisdiction, we take the well-pleaded allegations in plaintiff's complaint as true. See Puerto Rico Tel. Co. v. Telecommunications Reg. Bd., 189 F.3d 1, 7 (1st Cir. 1999). Founded in 1992, plaintiff Pejepscot Industrial Park, Inc. (d/b/a Grimmel Industries) engages in the business of salvaging, selling, and shipping scrap metal. Grimmel's facility in Topsham, Maine is connected by a 3,000-foot spur railroad track (the Pejepscot Spur Line) to the Lewiston Industrial Track, the main railroad track in the area.

In February 1991 one of the defendants, Maine Central Railroad ("MEC," a common carrier providing railroad freight services), executed a deed granting sections of the Lewiston Industrial Track to the State of Maine, including the Lewiston Lower Road Branch, the part of the main line to which the Pejepscot Spur Line connects. In conveying the Lewiston Lower Road Branch, however, MEC expressly reserved "a certain parcel of land in Topsham known as the 'Pejepscot Spur Line.'" (According to the complaint, MEC does not own the land over

-3-

which the Pejepscot Spur Line runs; that land is owned by Grimmel and its neighbor, the Eastbrook Timber Company.) It is this spur line, and defendants' desire to rip it up and sell it for scrap, that is at the heart of this case.

As part of the sale of portions of the Lewiston Industrial Track, MEC entered into a freight easement agreement with the State of Maine. The agreement provided that MEC retained all of its rights and obligations under federal law to provide common carrier freight service to shippers located on the lines conveyed to the state.

By 1994, Grimmel was ready to begin shipping scrap metal. The most efficient way to transport scrap metal is by rail. Grimmel requested that the defendants (MEC, Springfield Terminal Railway, which operates MEC's railroad, and their common owner, Guilford Transportation Industries) provide common carrier freight service to Grimmel's Topsham facility. Defendants refused, claiming that no appropriate rail cars were available. Grimmel shipped its material by different means for a time, and then requested rail service again. This time, defendants quoted Grimmel shipping rates, which Grimmel accepted. Before Grimmel could actually begin shipping, however, defendants again refused to provide service. Grimmel later began negotiations with the State of Maine over repairs to the Lewiston Lower Road Branch and the provision of service to

Grimmel's facility in anticipation of MEC's formal abandonment of rail service on the Lewiston Industrial Track line.

In June 1998, MEC filed with the STB a Notice of Exemption for abandonment and discontinuance of service over the Lewiston Industrial Track line. MEC represented that the state already owned the Lewiston Lower Road Branch portion of the line, and that the State of Maine, or a third party acting in conjunction with it, would acquire the remainder of the line and/or operating rights over it after it was abandoned. MEC also maintained that no salvage operations would be undertaken after abandonment -- that is, that the line would not be torn up -- and that the abandonment would not affect carrier operations in the area. The STB permitted MEC to abandon the line.

Defendants subsequently informed Grimmel that they intend to rip up the Pejepscot Spur Line and sell it for scrap. The state has agreed to upgrade the Lewiston Lower Road Branch, provided Grimmel upgrades the Pejepscot Spur Line. Grimmel has asked for MEC's permission to do so (at Grimmel's expense), but MEC has refused to grant permission. MEC's refusal prevents Grimmel from obtaining rail freight service.

**II.**

Grimmel filed a six-count First Amended Complaint in the district court. Count I sought a declaration of ownership rights of the Pejepscot Spur Line, while Count II sought an

injunction to prevent defendants from destroying the spur or interfering with Grimmel's right to repair, maintain, and use it. Count III alleged that the defendants unlawfully refused to provide rail service in violation of 49 U.S.C. § 11101(a), which requires rail carriers to provide service to shippers on reasonable request.

Count IV of Grimmel's complaint alleged that defendants violated their duty to Grimmel as a third-party beneficiary of the freight easement agreement between MEC and the State of Maine. Counts V and VI alleged breach of contract and tortious interference with business advantage and expectancies. Before answering the complaint, defendants moved under Fed. R. Civ. P. 12(b)(1) to dismiss the action with prejudice for lack of subject matter jurisdiction, or, in the alternative, to dismiss the action without prejudice under the doctrine of primary jurisdiction for all the issues within the special expertise of the STB.

Grimmel's complaint asserted two bases of subject matter jurisdiction: federal question jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367(a). The federal question identified was whether the defendants' refusal to provide rail service to Grimmel (and their planned destruction of the spur) had violated the ICCTA -- specifically, 49 U.S.C. § 11101(a). The district court held

that the ICCTA gave the STB exclusive jurisdiction over Grimmel's claim and granted defendants' motion to dismiss.

The STB's "[g]eneral jurisdiction" is described in 49 U.S.C. § 10501.  Under § 10501(b),

> [t]he jurisdiction of the [STB] over --
> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
> (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,
> is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. § 10501(b) (emphasis added).

Read in isolation, this language appears to grant the STB exclusive jurisdiction over any claim involving "transportation by rail carriers," id. § 10501(b)(1) -- an extremely broad category.  However, despite the description in § 10501(b) of the STB's jurisdiction as "exclusive," other sections of the ICCTA permit the filing of certain types of suits in federal district court.  See Pejepscot, 59 F. Supp. 2d at 113.  For example, 49 U.S.C. § 11705(a) establishes a three-

year statute of limitations on civil actions by rail carriers to recover payment for services provided; § 11705(b) establishes a three-year statute of limitations on civil actions by shippers to recover overcharges; and § 11706(d) authorizes civil actions by shippers to recover under a receipt or bill of lading. See id.; see also DeBruce Grain, Inc. v. Union Pac. R.R. Co., 983 F. Supp. 1280, 1283-84 (W.D. Mo. 1997) (noting the limitations periods in § 11705(a), (b), (e)), aff'd on other grounds, 149 F.3d 787 (8th Cir. 1998). It is difficult to reconcile these provisions with the notion that the STB has exclusive jurisdiction over all matters under the ICCTA.

The district court concluded that while these provisions undermine the exclusivity of the STB's jurisdiction, none of them were applicable to Grimmel's claim under § 11101(a) for unlawful refusal to provide rail service. See Pejepscot, 59 F. Supp. 2d at 114. "By its plain language, [§ 10501(b)] awards exclusive jurisdiction to the STB with respect to transportation by rail carriers, including a carrier's obligations under section 11101(a)." Id. at 113.

The district court rejected Grimmel's argument that § 10501(b) is a preemption provision only -- that it is intended to preempt state law and other federal remedies, not to strip the federal district courts of jurisdiction. The court acknowledged that the last sentence of § 10501(b), which states

that "the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law," <u>is</u> a preemption provision. <u>Pejepscot</u>, 59 F. Supp. 2d at 112 (internal quotation marks omitted). The court focused, however, on the preceding language, which states that the STB's jurisdiction over "transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules . . ., practices, routes, services, and facilities of such carriers" is "exclusive." <u>Id.</u> at 112-13 (internal quotation marks omitted). The court held that this was not merely a preemption provision, but a conferral of exclusive jurisdiction on the STB. <u>See</u> <u>id.</u> at 114.[2]

Grimmel's strongest argument for concurrent jurisdiction is based on § 11704(c)(1), which states:

> A person may file a complaint with the Board under section 11701(b) of this title <u>or bring a civil action under subsection (b) of this section to enforce liability against a rail carrier</u> providing transportation subject to the jurisdiction of the Board under this part.

---

[2] The district court also rejected Grimmel's argument that 49 U.S.C. § 11704(a) and (c)(1) provide the court with original jurisdiction over Grimmel's § 11101(a) claim. The district court found § 11704(a) inapplicable because it governs the enforcement of STB orders, and there was no existing STB order that Grimmel could have had the court enforce. <u>See</u> <u>Pejepscot</u>, 59 F. Supp. 2d at 113. Grimmel has wisely abandoned its § 11704(a) argument on appeal.

49 U.S.C. § 11704(c)(1) (emphasis added).  The district court

acknowledged that "[a]t first blush, § 11704(c)(1) appears to

authorize a civil action in this court." Pejepscot, 59 F. Supp.

2d at 113.  The court rejected this possible reading, however,

because it believed little of the STB's exclusive jurisdiction

under § 10501(b) would survive it.   See id.; see also DeBruce

Grain, 983 F. Supp. at 1283.  Instead, the court interpreted "to

enforce liability" in light of the entire statute to mean "to

enforce a determination previously made by the [STB]."

Pejepscot, 59 F. Supp. 2d at 113.[3]

Finally, the district court held that it could not

exercise supplemental jurisdiction under 28 U.S.C. § 1367(a)

over Grimmel's state law claims because of the absence of

federal subject matter jurisdiction. See Pejepscot, 59 F. Supp.

2d at 115 (citing, inter alia, United Mine Workers v. Gibbs, 383

---

[3]    Grimmel further argued that jurisdiction was nonetheless proper under 28 U.S.C. § 1331, the general federal question jurisdiction provision, and § 1337(a), which grants district courts original jurisdiction over any proceedings arising under any Act of Congress regulating commerce.  The district court correctly noted that the jurisdiction granted by both of these general statutes can be precluded by another, more specific statute -- and here, in its view, jurisdiction was specifically precluded by the ICCTA.  See Pejepscot, 59 F. Supp. 2d at 114-15.  On appeal, Grimmel does not contend that § 1331 or § 1337(a) can confer jurisdiction if the ICCTA has removed it.

U.S. 715, 725 (1966)).  Grimmel's entire action was dismissed with prejudice.  See id. at 110.

**III.**

A. Standard of Review

The district court's ruling that it lacked subject matter jurisdiction is subject to de novo review.  See Puerto Rico Tel. Co., 189 F.3d at 7.  The party invoking federal court jurisdiction bears the burden of proving its existence.  See id. The district court's decision not to exercise supplemental jurisdiction is reviewed for abuse of discretion.  See Vera-Lozano v. International Broad., 50 F.3d 67, 70 (1st Cir. 1995).

B. Subject Matter Jurisdiction over the ICCTA Claim

1. Burdens

Grimmel argues that nothing in the ICCTA abrogates federal district court jurisdiction over ICCTA claims, and so jurisdiction exists under 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1337(a) (jurisdiction over civil actions arising under any Act of Congress regulating commerce).  As a preliminary matter, Grimmel claims that once federal subject matter jurisdiction has been established under §§ 1331 and 1337, Congress can limit or remove it only by expressly stating its intention to create exclusive jurisdiction in another court or agency, citing Avery v. Secretary of HHS, 762 F.2d 158, 163 (1st Cir. 1985) ("[A]bsent a clear statement to the contrary,

legislation should not ordinarily be interpreted to oust a federal court's equitable power, or its jurisdiction over a pending case.").

Guilford replies that Grimmel bears the burden of demonstrating subject matter jurisdiction, and cannot use a presumption against the removal of such jurisdiction to avoid its burden. Guilford claims that Avery is inapplicable here because it involved a legislative attempt to intervene in a group of specific, pending actions. Guilford is correct that Avery is distinguishable. The ICCTA is in no sense an attempt to "oust a federal court's . . . jurisdiction over a pending case." Id. Grimmel cannot rely on any presumption of federal court jurisdiction; it must carry its burden of proving that subject matter jurisdiction exists. See Puerto Rico Tel. Co., 189 F.3d at 7.

2. 49 U.S.C. § 10501(b)

Section § 10501(b), which describes the STB's general jurisdiction, states without qualification that the STB's jurisdiction over, inter alia, "transportation by rail carriers" and the "operation, abandonment, or discontinuance of spur . . . tracks" is "exclusive." 49 U.S.C. § 10501(b). In interpreting this provision, however, we "will not look merely to a particular clause in which general words may be used, but will take in connection with it the whole statute . . . and the objects and

-12-

policy of the law." <u>Puerto Rico Tel. Co.</u>, 189 F.3d at 9 (quoting <u>Stafford</u> v. <u>Briggs</u>, 444 U.S. 527, 535 (1980)) (alteration in original) (internal quotation marks omitted).  As the district court correctly noted, later sections of the ICCTA strongly suggest that certain actions may be filed in federal district court -- and that in some areas the STB's jurisdiction is concurrent, not exclusive. See <u>Pejepscot</u>, 59 F. Supp. 2d at 113 (citing §§ 11705(a), (b), and 11706(d)).  The question, therefore, is whether § 11704(c)(1) grants the district court concurrent jurisdiction over Grimmel's ICCTA claim.

3. <u>49 U.S.C. § 11704(c)(1)</u>

Pointing to § 11704(c)(1), Grimmel argues that the ICCTA on its face contemplates enforcement through civil actions in federal district court.  Subsection (c)(1) states:

> A person may file a complaint with the Board under section 11701(b) of this title <u>or bring a civil action under subsection (b) of this section to enforce liability against a rail carrier</u> providing transportation subject to the jurisdiction of the Board under this part.

49 U.S.C. § 11704(c)(1) (Grimmel's emphasis).[4]  Grimmel claims

---

[4]    The "subsection (b)" referred to in the emphasized phrase reads: "[a] rail carrier providing transportation subject to the jurisdiction of the Board under this part is liable for damages sustained by a person as a result of an act or omission of that carrier in violation of this part."  49 U.S.C. § 11704(b).

that this subsection demonstrates Congress's intent to authorize concurrent STB and federal district court jurisdiction over ICCTA claims.

In response, Guilford argues that the district court properly viewed § 11704(c)(1) as only permitting a party to bring a civil action to "enforce [a] liability" that has been previously determined by the STB. Grimmel's proposed construction, says Guilford, is inconsistent both with the role Congress has assigned the STB and with the structure of the ICCTA. To buttress its position, Guilford cites the argument from the district court opinion in <u>DeBruce Grain</u>: if anyone seeking damages from a rail carrier can proceed in district court, "there will be nothing left of the Board's exclusive jurisdiction." <u>DeBruce Grain</u>, 983 F.Supp. at 1283. Guilford argues that while § 11704 provides remedies for violations of the ICCTA, providing a remedy is not the same as granting subject matter jurisdiction to the federal district courts. In Guilford's view, § 10501(b) requires that the remedies provided by § 11704 be pursued in the first instance before the STB.

Reading § 11704(c)(1) as Guilford urges -- as merely permitting a party to bring a civil action to enforce a liability previously determined by the STB -- presents a number of problems. First, there is the plain language itself: "[t]he words of the statute are the first guide to any interpretation

-14-

of the meaning of the statute." Greebel v. FTP Software, Inc., 194 F.3d 185, 192 (1st Cir. 1999). Subsection (c)(1) states that "[a] person may file a complaint with the Board . . . or bring a civil action under subsection (b) of this section to enforce liability against a rail carrier." 49 U.S.C. § 11704(c)(1). The most natural reading of this language is that it authorizes a person who has suffered damages as a result of a rail carrier's violation of the ICCTA either to file a complaint with the STB or to bring a civil action. See Pejepscot, 59 F. Supp. 2d at 113. Guilford's suggestion that "to enforce liability" should be understood as "to enforce [a] liability [previously determined by an STB order]" requires a significant leap from the subsection as written.

Furthermore, as Grimmel argues, this interpretation of subsection (c)(1) would render § 11704(c)(2) superfluous. Subsection (c)(2) authorizes a party who has obtained an award of damages from the STB to "bring a civil action to enforce that [award] . . . if the rail carrier does not pay the amount awarded." 49 U.S.C. § 11704(c)(2). If (c)(1) is interpreted only to permit a party to bring a civil action to "enforce [a] liability" previously determined by the STB, then (c)(2) is surplusage. A reading that renders a statutory provision surplusage is disfavored. See Massachusetts Ass'n of Health Maintenance Orgs. v. Ruthardt, 194 F.3d 176, 181 (1st Cir. 1999)

-15-

("[A]ll words and provisions of statutes are intended to have meaning and are to be given effect, and no construction should be adopted which would render statutory words or phrases meaningless, redundant or superfluous.") (quoting United States v. Ven-Fuel, 758 F.2d 741, 751-52 (1st Cir. 1985)) (internal quotation marks omitted).

Although the language of § 11704(c)(1) reads as though it is intended to establish concurrent jurisdiction, this seems to create a conflict with § 10501(b), which describes the jurisdiction of the STB as "exclusive."

Grimmel contends that the thrust of § 10501(b) is to preempt state law, and that there is no conflict between the "exclusive" language of § 10501(b) and the concurrent jurisdiction language of § 11704(c)(1). The district court found this interpretation of § 10501(b) unconvincing. See Pejepscot, 59 F. Supp. 2d at 112-13. The last sentence of § 10501(b) plainly preempts state law. See 49 U.S.C. § 10501(b)(2) ("Except as otherwise provided in this part, the remedies provided under this part with respect to the regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law."); see also, e.g., Burlington N. Santa Fe Corp. v. Anderson, 959 F. Supp. 1288, 1293 (D. Mont. 1997) (holding that § 10501(b)(2) expressly preempts state economic regulation of railroad operations). But

-16-

the first sentence of § 10501(b) is far less susceptible to this interpretation; indeed, it makes no mention of state law.[5] While it would be an unusual construction, "exclusive" could be understood to mean excluding state law. "Words can be ambiguous, often materially so." Massachusetts v. Blackstone Valley Elec. Co., 67 F.3d 981, 986 (1st Cir. 1995).

Left with some doubt about the plain meaning of the language, we must reach beyond the language of §§ 10501(b) and 11704(c)(1) and examine their history. "If the meaning is

---

[5] Guilford also argues that the lack of any limitations period in § 11705 for § 11704(b) claims filed with a district court, combined with the presence of a limitations period in that section for claims filed with the STB, implies that Congress did not intend the district courts to have jurisdiction over § 11704(b) claims. If § 11704(c)(1) creates a cause of action over which the district courts have jurisdiction, Guilford argues, then it is a cause of action without a statute of limitations -- an absurd result.

Although the lack of a specific limitations period in § 11705 does weigh in favor of Guilford's proposed interpretation of § 11704(c)(1), Guilford overstates its argument. As Grimmel points out, in the absence of a specific limitations period, the general four-year limitations period for civil actions under Acts of Congress applies. See 28 U.S.C. § 1658. Another possible resolution would be to apply in the district court the limitations period for claims filed with the STB. Cf. Aluminum Ass'n, Inc. v. Atchison, Topeka & Santa Fe Ry. Co., 746 F. Supp. 207, 213 n.18 (D.D.C. 1990) ("While there appears to be no parallel statute of limitations period for damages actions brought in District Court . . ., it is apparent from a reading of the statute [(the ICCTA's predecessor)] that Congress intended the statute of limitations periods to be the same for the same type of actions, regardless of whether they are brought before a district court or the [ICC].").

-17-

not plain from the words of the statute, then resort to legislative history is required."  Greebel, 194 F.3d at 192.

4. Legislative History

The legislative history, in our view, resolves this matter in favor of jurisdiction in the district court.  This strikes us as the most logical resolution of the quandary Congress created by using inconsistent language in §§ 10501(b) and 11704(c)(1).

a. 49 U.S.C. § 11704(c)(1)

Grimmel argues that the legislative history of the ICCTA demonstrates that Congress intended no change to the scheme of jurisdiction that existed under the Interstate Commerce Act (ICA). Under the ICA, Grimmel says, courts allowed parties to bring civil actions in federal court, and we must presume that Congress was aware of that practice.  See Cannon v. University of Chicago, 441 U.S. 677, 696-98 (1979) (stating that it is appropriate to assume that the drafters of Title IX were aware of the courts' prior interpretations of Title VI).

In the section-by-section analysis of the Act in the Conference Report on the ICCTA, § 11704 is described as follows: "Section [11704] reenacts the applicable rail portions of former section 11705.  These include authority for injured persons to seek judicial enforcement of agency orders and to seek damages for a violation of the statute."  H.R. Conf. Rep. No. 104-422,

-18-

at 195 (1995), <u>reprinted in</u> 1995 U.S.C.C.A.N. 850, 880 (emphasis added).  As might be expected given Congress's intent to "reenact" the old ICA provision, the language of current § 11704(c)(1) closely mirrors that of former § 11705.  Under the ICA, § 11705 provided: "A person may file a complaint with the [ICC] under section 11701(b) of this title or bring a civil action under subsection (b)(1) or (2) of this section to enforce liability against a common carrier providing transportation subject to the jurisdiction of the [ICC] . . . ."  49 U.S.C. § 11705(c)(1) (1994).[6]  Grimmel also notes that the ICC's jurisdiction was described as "exclusive" in the section of the ICA to which § 10501(b) of the ICCTA corresponds.  <u>See</u> 49 U.S.C. § 10501(d) (1994).  Grimmel claims that, despite the "exclusive" language, no court construed § 10501(d) of the ICA to bar federal district court jurisdiction over civil actions under the ICA.

---

[6]     Guilford argues that the policy underlying the ICA -- protecting the public from railroad monopolies -- is vastly different from the deregulatory impulse behind the ICCTA. Therefore, Guilford says, assuming that ICCTA and ICA provisions that share similar wording have the same meaning is risky.  But the legislative history quoted above clearly states that Congress intended to "reenact[]" former § 11705 in § 11704.  <u>See</u> H.R. Conf. Rep. No. 104-422, at 195 (1995), <u>reprinted in</u> 1995 U.S.C.C.A.N. 850, 880.  There is every reason to believe that Congress did not intend the meaning of this section to change.

Grimmel contends that such civil actions against rail carriers under the ICA were routinely brought in federal district court.  Grimmel offers as an example Overbrook Farmers Union Cooperative Ass'n v. Missouri Pacific Railroad Co., 21 F.3d 360 (10th Cir. 1994).  In Overbrook, a shipper sought damages in federal district court from a carrier for refusal to provide rail service on reasonable request in violation of 49 U.S.C. § 11101(a), the same provision underlying Grimmel's Count III.  See id. at 362.  The district court referred the question of the reasonableness of the rail carrier's refusal to provide service to the ICC, which determined that the refusal was unreasonable "and left the issue of damages to the district court."  Id.

Guilford denies that a system of concurrent jurisdiction existed under the ICA.  Guilford claims the decision most nearly on point under the ICA is Kraus v. Santa Fe Southern Pacific Corp., 878 F.2d 1193 (9th Cir. 1989), in which the Ninth Circuit held that the ICC's "exclusive" jurisdiction to assess mergers prevents a private suit in federal court under the Interstate Commerce Act for damages caused by the merger. See id. at 1197-98.  As Grimmel points out, Kraus is easily distinguishable.  The specific Interstate Commerce Act provision at issue in Kraus required prior express approval of the ICC for all railroad mergers and did not provide for a private civil

remedy.  See id. at 1198; see also 49 U.S.C. § 11341(a) (1994) ("The authority of the Interstate Commerce Commission under this subchapter [i.e., the ICA subchapter governing mergers] is exclusive.").

The legislative history of § 11704 of the ICCTA indicates that Congress intended to maintain the status quo that had existed under the ICA.  Overbrook demonstrates that under the ICA, a district court could exercise jurisdiction over a refusal of service claim; Kraus is not to the contrary.  See also Aluminum Ass'n, Inc. v. Atchison, Topeka & Santa Fe Ry. Co., 746 F. Supp. 207, 210 (D.D.C. 1990) (stating that the ICA "specifically empowers both the ICC and District Courts to entertain complaints for reparations or damages as a result of illegal acts or omissions of a carrier's actions pursuant to 49 U.S.C. § 11705(b)(2)").

b. 49 U.S.C. § 10501(b)

The legislative history of § 10501 of the ICCTA also offers support for Grimmel's argument that in establishing the STB's jurisdiction under the ICCTA, Congress intended only to preempt state law and remedies, not to give the STB exclusive jurisdiction over ICCTA claims.

First, under the heading "Remedies are exclusive," the section-by-section analysis found in the House Report on the ICCTA states: "The bill is intended to standardize all economic

regulation (and deregulation) of rail transportation under Federal law, without the [previous regime of] optional delegation of administrative authority to State agencies to enforce Federal standards . . . ."  H.R. Rep. No. 104-311, at 95, <u>reprinted in</u> 1995 U.S.C.C.A.N. 793, 807.[7]  Second, under the heading "General jurisdiction," the Report states that changes were made to the jurisdictional provision

> to reflect the direct and complete pre-emption of State economic regulation of railroads.  The changes include <u>extending exclusive Federal jurisdiction</u> to matters relating to spur, industrial, team, switching or side tracks formerly reserved for State jurisdiction . . . .  The former disclaimer regarding residual State police powers is eliminated as unnecessary, in view of the Federal policy of occupying the entire field of economic regulation of the interstate rail transportation system.

---

[7]    The "delegation of administrative authority to State agencies" refers to the system established by the ICCTA's predecessor, the Staggers Rail Act of 1980, Pub. L. No. 96-448, 94 Stat. 1895.  The Staggers Rail Act "began the substantial economic deregulation of the [railroads] and the whittling away of the size and scope of the ICC."  H.R. Rep. No. 104-311, at 82, <u>reprinted in</u> 1995 U.S.C.C.A.N. at 793-94.  The Act provided a federal certification procedure for states that wanted to regulate intrastate rail rates, rules, or practices.  <u>See</u> 49 U.S.C. § 11501(b)(2)-(3) (1994).

The Staggers Rail Act also denied the ICC authority over wholly intrastate "spur, industrial, team, switching, or side tracks," 49 U.S.C. § 10907(b)(1) (1994), thus leaving them subject to state regulation, <u>see</u> <u>Illinois Commerce Comm'n</u> v. <u>ICC</u>, 879 F.2d 917, 922 (D.C. Cir. 1989).  The ICCTA, by contrast, specifically grants the STB authority over "spur, industrial, team, switching, or side tracks . . ., <u>even if</u> the tracks are located . . . entirely in one State."  49 U.S.C. § 10501(b)(2) (emphasis added).

<u>Id.</u> at 95-96, <u>reprinted in</u> 1995 U.S.C.C.A.N. at 807-08 (emphasis added). The thrust of the statute is to federalize these disputes, not to deprive the federal courts of jurisdiction.[8]

Guilford argues that the references to preemption of state law and regulation in the legislative history of § 10501(b) are simply beside the point. Guilford says that the references do not address the question of whether that section, in addition to preempting state law, establishes exclusive jurisdiction in the STB. We do not find the history of § 10501(b) as unhelpful as Guilford suggests. While not determinative by itself, the focus on preemption of state law in the legislative history does give Grimmel's suggested interpretation of § 10501(b) some additional plausibility.

Arguments both for and against concurrent jurisdiction can be drawn from the language and structure of the ICCTA, its legislative history, and case law. Viewing the language of the

---

[8] The legislative history also shows that Congress intended the STB to be smaller -- and have fewer resources -- than the ICC. When Congress terminated the ICC, it had five commissioners and about 400 employees. <u>See</u> H.R. Rep. No. 104-311, at 82, <u>reprinted in</u> 1995 U.S.C.C.A.N. at 794. The STB has three commissioners, <u>see</u> <u>id.</u>, and Congress expected only 60 ICC employees to transfer to the STB, <u>see</u> <u>id.</u> at 90, <u>reprinted in</u> 1995 U.S.C.C.A.N. at 802. The ICC's 1995 budget was $33 million; only $8.4 million of the Department of Transportation's 1996 budget was devoted to the STB. <u>See</u> <u>id.</u> at 93, <u>reprinted in</u> 1995 U.S.C.C.A.N. at 805. This decrease in size and resources is not consistent with exclusive STB jurisdiction.

ICCTA in light of its legislative history and the evidence of practice under its predecessor, the ICA, we conclude that Grimmel has successfully carried its burden of establishing the existence of federal district court jurisdiction over its ICCTA claim.

C. Primary Jurisdiction

The question remains whether the district court should refer Grimmel's ICCTA claim to the STB under the doctrine of primary jurisdiction. Guilford argues that such a referral is appropriate because referral to the STB will promote uniformity in the interpretation of the ICCTA, and because the STB is "better equipped than [the] courts by specialization, by insight gained through experience, and by more flexible procedure" to decide the question. Nader v. Allegheny Airlines, Inc., 426 U.S. 290, 304 (1976) (quoting Far East Conference v. United States, 342 U.S. 570, 574-75 (1952)) (internal quotation marks omitted). Grimmel argues that the district court is capable of ruling on Grimmel's ICCTA claim without referral to the STB. In Grimmel's view, no technical issues exist for the STB's consideration.

The Supreme Court has said that "[n]o fixed formula exists for applying the doctrine of primary jurisdiction." United States v. Western Pac. R.R. Co., 352 U.S. 59, 64 (1956). The primary jurisdiction doctrine is intended to "serve[] as a

means of coordinating administrative and judicial machinery" and to "promote uniformity and take advantage of agencies' special expertise." Mashpee Tribe v. New Seabury Corp., 592 F.2d 575, 580 (1st Cir. 1979). This court relies on three factors to guide the decision on whether to refer an issue to an agency under the primary jurisdiction doctrine:

> (1) whether the agency determination l[ies] at the heart of the task assigned the agency by Congress; (2) whether agency expertise [i]s required to unravel intricate, technical facts; and (3) whether, though perhaps not determinative, the agency determination would materially aid the court.

Blackstone Valley Elec. Co., 67 F.3d at 992 (quoting Mashpee Tribe, 592 F.2d at 580-81) (alterations in original).

We conclude that the district court should stay Grimmel's ICCTA claim while referring it to the STB. First, the STB's expertise is clearly involved in the question of whether Guilford's actions constitute unlawful refusal to "provide . . . service on reasonable request," 49 U.S.C. § 11101(a), and the agency's determination would materially aid the district court. Furthermore, referral to the STB will promote uniformity in the standards governing refusals to provide service. See DeBruce Grain, 149 F.3d at 790 (affirming on primary jurisdiction grounds district court's conclusion that a refusal of service claim should be heard by the STB); Overbrook, 21 F.3d at 363

(describing district court's referral of a refusal of service claim to the ICC).

D. Disposition of the State Law Claims

The district court held that it could not exercise supplemental jurisdiction over Grimmel's state law claims because of the absence of federal subject matter jurisdiction. Because we conclude that subject matter jurisdiction exists, the premise for the dismissal has vanished.

Guilford argues that Counts I and II do not satisfy the requisites for supplemental jurisdiction and must be dismissed, while Counts IV, V, and VI are preempted by the ICCTA and must be dismissed. Grimmel, on the other hand, contends that the district court should stay only those claims relating to defendants' refusal to provide service, pending referral to the STB, and proceed on the merits of the remaining claims.

The decision whether to exercise supplemental jurisdiction is left to the sound discretion of the district court. See Vera-Lozano v. International Broad., 50 F.3d 67, 70 (1st Cir. 1995). A federal court may exercise supplemental jurisdiction over a state claim whenever it is joined with a federal claim and the two claims "derive from a common nucleus of operative fact" and the plaintiff "would ordinarily be expected to try them both in one judicial proceeding." Id. (quoting United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966))

(internal quotation marks omitted). The supplemental jurisdiction statute states that a district court may refuse to exercise supplemental jurisdiction if the state claim "substantially predominates over the claim or claims over which the district court has original jurisdiction" or "the claim raises a novel or complex issue of state law." 28 U.S.C. §§ 1367(c)(1), (c)(2). The district court should consider on remand whether to stay, act on, or dismiss Grimmel's state law claims.

## IV.

The district court's order dismissing Grimmel's complaint is <u>vacated</u>. The case is <u>remanded</u> to the district court for further proceedings in accordance with this opinion.

So ordered.