# United States Court of Appeals
## For the First Circuit

No. 03-1941

RYMES HEATING OILS, INC.,

Plaintiff, Appellant,

v.

SPRINGFIELD TERMINAL RAILWAY CO.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, <u>Chief U.S. District Judge</u>]

Before

Lynch, <u>Circuit Judge</u>,
Stahl, <u>Senior Circuit Judge</u>,
and Lipez, <u>Circuit Judge</u>.

<u>Robert M. Thomas, Jr.</u>, with whom <u>Rory H. Delaney</u> and <u>Thomas & Associates</u> were on brief, for appellant.

<u>Eric L. Hirschhorn</u>, with whom <u>Robert B. Culliford</u> and <u>Winston & Strawn</u> were on brief, for appellee.

February 13, 2004

**LYNCH**, **Circuit Judge**.  This is a dispute between an extremely dissatisfied shipper and a rail carrier, Springfield Terminal Railway.  The shipper, Rymes Heating Oils, says it was stymied in its efforts to get satisfactory rail service from Springfield by Springfield's misrepresentations to it that Springfield had exclusive trackage rights to the side track connecting to Rymes's propane distribution center.  Rymes took the exclusive rights dispute to the Surface Transportation Board (STB) in September 2001 and, over Springfield's objection, obtained an order in July 2002 declaring that Springfield did not have such exclusive trackage rights.  Rymes then sued in federal court, invoking a provision of the Interstate Commerce Commission Termination Act (ICCTA), 49 U.S.C. §§ 11704(b), and saying, based on the administrative order, that it was entitled to damages flowing from the misrepresentations.  In the complex world of federal regulation of railroads, we affirm the dismissal of Rymes's damages claim, which was never presented to the STB.

**I.**

The parties agreed before the district court to treat this as a case stated.  Where facts are in dispute, we describe the dispute.  Those disputes, however, are immaterial, given the grounds for our decision.

The story starts with a series of orders by the Interstate Commerce Commission (ICC), now known as the Surface

Transportation Board (STB), in the late 1980s and early 1990s. Springfield is the successor in interest of the Boston & Maine Corporation (B&M). B&M at one time owned the portion of the Connecticut River Line involved in this case. In August 1988, the ICC ordered B&M to convey the Connecticut River Line to the National Railroad Passenger Corporation (Amtrak) under 45 U.S.C. § 562(d). Nat'l R.R. Passenger Corp. -- Conveyance of B&M Corp. Interests in Conn. River Line in Vt. & N.H., 4 I.C.C.2d 761, 767-73 (1988) (hereinafter "Amtrak I"). In a related petition, the ICC then allowed Amtrak to turn around and sell the line to Central Vermont Railway. Id. at 798-800. The ICC required, however, that B&M be paid just compensation and allowed to retain some trackage rights on the line after these transactions took place. Id. at 798, 800.

B&M and Central Vermont were to negotiate the precise scope of the trackage rights to be retained by B&M, but negotiations failed and the ICC stepped in to resolve the dispute. The ICC imposed a trackage rights order, Nat'l R.R. Passenger Corp. -- Conveyance of B&M Corp. Interests in Conn. River Line in Vt. & N.H., 6 I.C.C.2d 539 (1990) (hereinafter "Amtrak II"), that was still in effect at the time of the events in this suit. Under Amtrak II, Springfield, as B&M's successor, has the "exclusive right to serve all existing shippers and shippers' facilities that were located on the [line] as of [September 9, 1988], including any

-3-

and all new shippers that locate at such existing facilities after [that date], provided that [Springfield] makes available a minimum three day per week service." Id. at 560. Springfield can compete with New England Central Railroad (NECR), Central Vermont's successor, to provide rail service to remaining shippers not covered by the exclusive right. That "exclusive right" is at the heart of Rymes's case.

Rymes sells propane to customers in central and southern New Hampshire. Between 1995 and 1996, Rymes built a propane distribution center in Claremont, New Hampshire. Rymes also laid a new stretch of railroad track that connected the distribution center to an existing side track, which in turn connected to the Connecticut River Line.

In November 1996, after construction of the distribution center was completed, Springfield began to provide rail service to the center. In his affidavit, James Rymes, the owner of Rymes Heating Oils, said that his company was harmed by "incessant delays" in Springfield's service and by Springfield's "constant" failures to make deliveries and pick up empty cars after delivery. As a result, Rymes said that his company had to purchase more expensive propane imported by other means, arrange for deliveries by road, buy a fleet of trucks, build an expanded storage facility, and restructure its bank financing to pay for the new storage facility.

-4-

Rymes said that he knew that Springfield had competitors on the rail line, namely NECR, but that his company did not switch carriers because Springfield repeatedly and inaccurately represented to him that it had the exclusive right to provide service to the Claremont distribution center.[1] Springfield, however, denies making any such representations. By affidavit, Kenneth Berg, Springfield's director of marketing, stated that Springfield and Rymes never actually discussed whether Springfield had the exclusive right to serve Rymes. Springfield's vice-president of marketing, Joseph Crawford, stated by affidavit that both Springfield and Rymes simply believed that Springfield had the exclusive right to serve the Claremont distribution center. According to Crawford, Springfield thought that Rymes was a "new shipper[]" located at an "existing facilit[y]" under Amtrak II because the distribution center was connected to the Connecticut River Line through a side track built prior to September 9, 1988. Whether or not Springfield made the representations complained of is immaterial to the outcome here.

In September 2001, Rymes petitioned the STB, seeking a declaration that, under Amtrak II, it was entitled to receive competitive service at its Claremont distribution center from NECR as well as from Springfield. Rymes did not seek any damages in its

---

[1] Those at Rymes Heating Oils apparently failed to read Amtrak I and Amtrak II.

-5-

petition. The STB instituted a declaratory order proceeding pursuant to 5 U.S.C. § 554(e) and 49 U.S.C. § 721 of the ICCTA. Springfield opposed the petition, arguing (1) that Rymes did not have standing to seek relief because Rymes was not a party to Amtrak II, (2) that the STB did not have jurisdiction to grant relief, and (3) on the merits, that Springfield had an exclusive right to serve the Claremont distribution center because Rymes was a new shipper located at an existing facility. On July 17, 2002, the STB issued an order declaring that Rymes had standing to seek relief under Amtrak II and that the STB had jurisdiction to interpret Amtrak II and to grant any appropriate relief. Rymes Heating Oils -- Petition for Declaratory Order, STB Finance Docket No. 34098 (July 17, 2002) (hereinafter "Rymes Order"). Proceeding to the merits, the STB then held that "Rymes is neither an existing shipper nor a new shipper located at an existing facility within the meaning of [Amtrak II]." Id. The net effect of the order was that Springfield did not have the exclusive right that it thought it had (and which, perhaps, it had represented it had). The STB reasoned that even though Rymes's distribution center was connected to the rail line through an existing side track, the center was "located" at a new facility (namely, the new side track laid by Rymes). Id. The STB therefore entered a declaratory order that "Rymes is entitled to obtain competitive service from NECR." Id. That was the full extent of the relief granted.

Rymes then decided to pursue a damages action, taking the position that it had been hoodwinked by Springfield into believing that Springfield had the exclusive right to serve the Claremont distribution center. Rymes argues that if it had not been hoodwinked, it would have changed sooner to a different carrier, and, if it had changed sooner, it would not have suffered the damages that it did.

## II.

On December 20, 2002, Rymes sued Springfield in federal district court, seeking damages. Count One of the complaint alleged that Springfield had "wrongfully excluded competition" in rail service to the Claremont distribution center from 1996 to 2002 in violation of 49 U.S.C. § 11704(b) of the ICCTA. Count Two, which was eventually dismissed without prejudice and is of no relevance to this appeal, alleged that Springfield had failed to provide the timely and reasonable service to Rymes required by Amtrak II and had thus violated 49 U.S.C. §§ 11101 and 11704 of the ICCTA. Rymes sought damages including but not limited to: "a) the costs of constructing and maintaining expanded storage facilities, b) the cost of acquiring additional trucks to obtain and move the product, c) additional acquisition costs of propane on the spot market, and d) additional financing costs due to the impact these expenditures had on Rymes's credit with its major lender, Fleet Bank."

On January 27, 2003, Springfield moved to dismiss. Springfield argued that Rymes had no cause of action for Count One under 49 U.S.C. § 11704(b) because that statute provides a private right of action only for violations of the Interstate Commerce Commission Termination Act (ICCTA). Amtrak II, Springfield argued, was issued under the Rail Passenger Service Act (RPSA), 45 U.S.C. § 562(d) (1988) (current version at 49 U.S.C. § 23511(c)), under which no private right of action is available. Moreover, Springfield contended that even if Amtrak II had been issued under the ICCTA,[2] § 11704(b) provides a private right of action only for violations of the ICCTA itself, not for violations of administrative orders issued pursuant to the ICCTA. Springfield then argued that the Carmack Amendment, 49 U.S.C. § 11706(a), which governs claims for loss or damage of goods in shipping, provided the exclusive remedy for the type of injuries claimed by Rymes in both Count One and Count Two. Treating both counts as Carmack Amendment claims, Springfield argued that the court lacked subject matter jurisdiction and that even if there were jurisdiction, the claims were time-barred. In the alternative, if the court did not agree that the action was founded entirely on the Carmack Amendment, Springfield moved to refer the case to the STB under the

---

[2] At the time Amtrak II was issued, the relevant provisions of the ICCTA were part of the Interstate Commerce Act (ICA). For the sake of clarity and convenience, however, this opinion refers to these provisions as part of the ICCTA.

primary jurisdiction doctrine for, inter alia, a determination whether Springfield could be held liable for damages based on the Rymes Order.

The district court held a hearing on the motion to dismiss on February 19, at which the parties agreed that the dispute over Count One involved mostly legal issues and that, at most, very limited factual development was necessary. The court denied the motion to dismiss. With the agreement of the parties, the court adopted an accelerated schedule for the filing of cross-motions for summary judgment on Count One, noting that full-blown discovery would not be necessary, and deferred consideration of Count Two until after those motions were resolved.

Less than a month later, on March 17, 2003, Rymes and Springfield filed cross motions for summary judgment on Count One.[3] Springfield asserted substantially the same arguments as in its motion to dismiss. At the April 8 hearing on the motions, Rymes conceded that "there are no genuine issues of material fact on the liability as to Count One," and the parties agreed to treat the issue of liability under Count One as a case stated.

On April 16, the court raised sua sponte the question whether Springfield owed any legal duty at all to Rymes as to Count One. The court apparently viewed the case as turning on rights

---

[3]    Rymes moved for summary judgment on Count One as to liability only.

arising under state contract and quasi-contract law, despite the heavy federal regulation of this area. On May 30, 2003, after additional briefing by both sides on the issue, the court granted summary judgment to Springfield on Count One, concluding that Rymes had no cause of action.[4] After the court granted summary judgment to Springfield on Count One, Rymes voluntarily dismissed Count Two without prejudice and requested entry of a final order to allow an immediate appeal of the court's ruling on Count One.

## III.

The court entered a final order, and Rymes appealed. Springfield urges alternative grounds for affirmance: namely, that Rymes had no claim under § 11704(b) for the reasons advanced in Springfield's motion to dismiss and that, to the extent Rymes's claim is based on state law, it is preempted by the Carmack Amendment and is time-barred under that Amendment.

At oral argument, we asked the parties whether the Carmack Amendment provides the exclusive remedy under Count One. Rymes responded, inter alia, that the Carmack Amendment would not

---

[4] Rymes, the court found, had identified only one plausible basis for its cause of action: that Springfield had contractually breached its implied duty of good faith and fair dealing under Amtrak II. But the court determined that, even if the STB's ruling in Amtrak II constituted a contract under Massachusetts law, Springfield owed no legal duty to Rymes under this "contract." The court reasoned that because Rymes was not a party to Amtrak II, Rymes could recover only if it was an intended third-party beneficiary of the decision. Rymes, the court held, was not an intended third-party beneficiary because Amtrak II did not have a clear and definite intent to benefit shippers such as Rymes.

-10-

apply to its claim for damages based on the difference in the rates charged by Springfield and by NECR.[5]  We ordered supplemental briefing on this issue and on whether a rate differential claim should be adjudicated by the STB rather than by a federal court. In the supplemental briefing, Rymes stressed that it was not bringing a Carmack Amendment claim at all in Count One.

In its complaint and district court filings, Rymes pled Count One as a claim under 49 U.S.C. § 11704(b).  Although Springfield and the district court have spent much time discussing whether Rymes might have a viable state law claim for breach of contract and whether that claim would be preempted by the Carmack Amendment, Rymes did not assert any such claim in the district court proceedings, so we do not address it.  Similarly, because Rymes insisted in its district court filings and on appeal that it is not asserting a Carmack Amendment claim, we do not address any possible Carmack Amendment claim by Rymes or the possible interaction between the Carmack Amendment and § 11704(b).

---

[5]  We do not consider this damages claim in our analysis because it was raised for the first time at oral argument.  No such damages claim was brought in Rymes's complaint, which alleges damages based only on "expenses [Rymes] was forced to incur due to [Springfield's] substandard service."  And Rymes presented no evidentiary support for a rate differential claim on summary judgment.  None of the three affidavits that constituted Rymes's evidence on summary judgment made any mention of rate differential damages.  Indeed, although the complaint alleges that the service eventually provided by NECR after July 2002 was "less expensive" than Springfield's service had been, neither the complaint nor the affidavits indicate whether NECR's prices were higher or lower than Springfield's during the relevant time period -- that is, from November 1996 to May 2002.

Count One was brought under § 11704(b), which states that "[a] rail carrier providing transportation subject to the jurisdiction of the [Surface Transportation] Board . . . is liable for damages sustained by a person as a result of an act or omission of that carrier in violation of [the rail portion of the ICCTA]." Section 11704(c)(1) then provides a private right of action for such liability: "A person may . . . bring a civil action under subsection (b) of this section to enforce liability against a rail carrier." 49 U.S.C. § 11704(c)(1). Here, Rymes makes no claim that the statute itself independently imposed a duty that was violated. Rymes's claim in Count One depends instead on the language of Amtrak II, as further interpreted in the Rymes Order. Rymes argues that Springfield's inaccurate assertion of monopoly rights violated Amtrak II and that this violation of Amtrak II was tantamount to a violation of the ICCTA itself.

The first issue raised by Rymes's position is whether Amtrak II was issued pursuant to the ICCTA or pursuant to the Rail Passenger Service Act. If Amtrak II was issued pursuant to the RPSA, Rymes would clearly have no cause of action under it: no private right of action is available for violations of the RPSA, Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers, 414 U.S. 453, 464-65 (1974), and § 11704(b) would not apply because there would be no violation of the ICCTA.

-12-

It is not clear, however, whether the trackage rights order in <u>Amtrak II</u> was issued pursuant to the RPSA or the ICCTA. <u>Amtrak II</u> does not expressly state the statute under which it was issued, but several clues suggest that <u>Amtrak II</u> may, in fact, have been decided under the ICCTA.

First, the RPSA does not authorize the ICC to set trackage rights between private railroads such as B&M and Central Vermont; only the ICCTA authorizes such an order.[6]  Springfield argues that <u>Amtrak II</u> does not set trackage rights between ordinary private railroads, but rather between Amtrak and B&M, and that the RPSA does authorize the ICC to set trackage rights between a private railroad and Amtrak when Amtrak is buying rail property. <u>See</u> 49 U.S.C. § 24311(c).  Springfield argues that <u>Amtrak II</u> sets rights between B&M and Amtrak, with Central Vermont merely standing

---

[6]    Springfield argues that 49 U.S.C. § 11324 -- the provision of the ICCTA that authorizes the ICC to impose a trackage rights order as a condition of its approval of a rail property transaction -- does not apply here.  Specifically, Springfield notes that Central Vermont petitioned the ICC to exempt its acquisition of the rail line from the traditional § 11324 review process and that the ICC granted that petition.
       We are not sure, however, that this exemption takes the trackage rights order outside the ICCTA.  The ICC's power to grant an exemption is itself based on the ICCTA.  The ICCTA allows the ICC to exempt transactions only when the ICC determines that regulation is not necessary to carry out the transportation policy of the ICCTA.  <u>See</u> 49 U.S.C. § 10502.  Here, the ICC granted an exemption to Central Vermont because Central Vermont forestalled possible objections to competitive effects of the acquisition under § 11324 by voluntarily agreeing to grant trackage rights to B&M on terms to be determined by the ICC.  <u>See</u> <u>Amtrak I</u>, 4 I.C.C.2d 761, 799-800.  The ICC's imposition of the trackage rights order could thus be read as an exercise of its power under § 10502.

in Amtrak's shoes as the eventual owner of the rail line. The weakness of this argument is that Amtrak II extends trackage rights to B&M on sections of the Connecticut River Line that Central Vermont already owned before its transaction with Amtrak. See Amtrak II, 6 I.C.C.2d at 559-60. The ICC had authority to set those rights only under the ICCTA, not the RPSA.

Second, the ICC imposed labor protective conditions on Central Vermont's purchase of the rail line. The ICCTA requires the ICC to consider labor interests, see 49 U.S.C. § 11324(b)(4), but the RPSA does not, see 49 U.S.C. § 24311(c).

Third, the Rymes Order, which explicates Amtrak II, recites that the declaratory order proceeding was instituted, inter alia, under 49 U.S.C. § 721, which enumerates the powers of the Board under the ICCTA.

In light of those clues, we assume arguendo, in Rymes's favor, that Amtrak II was issued under the ICCTA, and we move to the next step in the analysis: whether and when § 11704(b) provides a cause of action for damages based on the violation of an STB or ICC order.

Most commonly, liability under § 11704(b) and its predecessor statute, 49 U.S.C. § 8, is invoked in cases in which a shipper complains that rates charged by the railroads are unjust and unreasonable and seeks reimbursement ("reparations") of unlawful transportation charges. See, e.g., Interstate Commerce

-14-

Comm'n v. Atlantic Coast Line R. Co., 383 U.S. 576 (1966). By contrast, where the claim for damages is for actual loss or injury to the property caused by the carrier, it is usually brought under the Carmack Amendment to the ICCTA, 49 U.S.C. § 11706. See N.Y., Phila., & Norfolk R.R. Co. v. Peninsula Produce Exch. of Md., 240 U.S. 34, 38 (1916) (Carmack Amendment covers "all damages resulting from any failure to discharge a carrier's duty with respect to any part of the transportation to the agreed destination"); Rini v. United Van Lines, 104 F.3d 502, 503 (1st Cir. 1997).

Leaving issues of primary jurisdiction aside, § 11704(b) clearly provides a damages action for a direct statutory violation of the ICCTA itself, cf. Pejepscot Indus. Park, Inc. v. Me. Cent. R.R. Co., 215 F.3d 195, 198 (1st Cir. 2000) (claim that unlawful refusal to provide rail service violates 49 U.S.C. § 11101(a) of the ICCTA), but Rymes has not claimed any such violation in Count One.

Section 11704(b) also clearly provides a cause of action to enforce an STB order awarding damages. This is because 49 U.S.C. § 11704(d) lays out a series of procedural requirements that apply "[w]hen a person begins a civil action under subsection (b) of this section to enforce an order of the Board requiring the payment of damages by a rail carrier." But Rymes has obtained no such order. Amtrak II obviously made no award of damages to Rymes for Springfield's actions, and Rymes neither sought nor received

-15-

such an award from the STB in the Rymes Order.  Nor did the Rymes Order find that Springfield had acted unlawfully under the ICCTA by doing something prohibited or omitting to do something required, which are the prerequisites for a damages action under § 11704(b).

Rymes's claim is instead a hybrid one, purporting to be based on the argument that § 11704(b) creates a cause of action for a violation of two orders -- namely, Amtrak II and the Rymes Order -- that neither found the conduct of which Rymes complained to be unlawful nor awarded damages to Rymes.  Even assuming arguendo that § 11704(b) provides a damages action for violations of some STB orders beyond those requiring payment of damages by a carrier,[7] such a claim could only be stated if the STB order actually prohibits the conduct in question or requires conduct that has not been carried out.  If no claim of statutory violation is made and

_____

[7]    Springfield effectively concedes that 49 U.S.C. § 8, an older version of § 11704(b), did provide a cause of action for violations of STB orders, including those that awarded no damages. See, e.g., Nemitz v. Norfolk & W. Ry. Co., 436 F.2d 841, 850 (6th Cir. 1971).  Springfield argues, however, that the cause of action under § 8 relied on language in ICCTA's predecessor statute, the Interstate Commerce Act (ICA), which stated that "it shall be the duty of every common carrier . . . to observe and comply with [ICC] orders."  49 U.S.C. § 16(7) (1976) (repealed 1978).  This language, Springfield notes, was eliminated in 1978.  Interstate Commerce Act, P.L. 95-473, 92 Stat. 1337.  However, Congress stated that the 1978 amendments were intended to "revise, codify, and enact without substantive change the Interstate Commerce Act."  See id. (emphasis added).  This legislative history suggests that § 11704(d) should encompass the same causes of action that were available under § 8 before 1978.

-16-

no claim of a violation of an STB order is stated, § 11704(b) cannot apply.

Here, Amtrak II does not on its face prohibit the misrepresentations allegedly made by Springfield. Amtrak II is a trackage rights order; it makes no reference to duties to make or refrain from making representations about who may serve particular shippers. Trackage rights orders are often complex and open to several interpretations. It does not follow from the fact that the Rymes Order resolved the extent to which Springfield had exclusive trackage rights that there were any duties imposed earlier as to representations about those rights.[8] In short, we do not read the language in Amtrak II or the Rymes Order as creating a claim of the type asserted here, under which suit could be brought in federal court through § 11704(b).

Rymes's claim under Amtrak II and the Rymes Order raises another concern: that of primary jurisdiction. "[T]he primary jurisdiction doctrine requires initial submission to the [STB] of questions that raise issues of transportation policy which ought to be considered by the [STB] in the interests of a uniform and expert

---

[8] We note in passing that Rymes's complaint does not allege bad faith, and neither party's supporting affidavits indicate that Springfield knew or should have known that it did not have the exclusive right to serve Rymes under Amtrak II. Indeed, from Rymes Order, it appears that Springfield did have a colorable textual basis for its interpretation of Amtrak II, albeit one with policy implications that the Board found troubling and thus ultimately rejected. Rymes Heating Oils -- Petition for Declaratory Order, STB Finance Docket No. 34098 (July 19, 2002).

administration of the regulatory scheme laid down by [the ICCTA]." Atlantic Coast Line, 383 U.S. at 579 (internal quotation marks omitted). Specifically, three factors are relevant to whether the primary jurisdiction doctrine applies: "(1) whether the agency determination lies at the heart of the task assigned the agency by Congress; (2) whether agency expertise is required to unravel intricate technical facts; and (3) whether, though perhaps not determinative, the agency determination would materially aid the court." Pejepscot, 215 F.3d at 205. All three of those factors are invoked here. The STB's expertise is clearly involved, and its determination would materially aid the federal courts. Many of the central questions raised in this case turn on the interpretation of orders issued by the STB or its predecessor, the ICC. Those questions include whether Amtrak II was issued pursuant to the RPSA or the ICCTA, what duties were actually imposed by Amtrak II and the Rymes Order, and to what extent damages are available when those duties are violated. The STB is uniquely suited to determine not only the purpose of those orders but also the likely effect of the various interpretations on transportation policy. Furthermore, obtaining an initial STB decision promotes uniformity in the interpretation of trackage rights orders. See Thompson v. Texas Mexican Ry. Co., 328 U.S. 134, 147-48 (1946) (holding that the ICC had primary jurisdiction to interpret a trackage rights agreement because "[i]t is the function of the

-18-

Commission to determine the terms and conditions under which trackage rights are acquired").  Accordingly, even were we to assume dubitante that a viable cause of action were stated in federal court, we would still respect the primary jurisdiction of the STB to decide questions such as the ones raised here and would require that the action be dismissed.[9]  See Pejepscot, 215 F.3d at 205-06.

## IV.

The district court's entry of judgment in favor of Springfield is **affirmed**.  Costs are awarded to Springfield.  So ordered.

---

[9]     When an agency has primary jurisdiction, the court has discretion either to stay the case pending an STB determination or, if the parties would not be unfairly disadvantaged, to dismiss the case without prejudice.  Reiter v. Cooper, 507 U.S. 258, 269-70 (1993).  "Dismissal of the complaint may be appropriate when all of the relief that is sought in court can be obtained in an administrative forum . . . ."  Hansen v. Norfolk & W. Ry. Co., 689 F.2d 707, 714 (7th Cir. 1982).